Smith F. BRANDOM, Jr., Kenneth Belling
and Michael Gilboy, Petitioner-
Appellants,

v.

UNITED STATES of America,
Respondent-Appellee.

Nos. 17276–17278.

United States Court of Appeals,
Seventh Circuit.

June 30, 1970.

As Amended on Denial of Rehearings
Sept. 29, 1970.

H. George Lafferty, Kansas City, Mo., Earl A. Charlton, Gaar W. Steiner, Charlton, Yanisch, Greco & Roffa, Milwaukee, Wis., for Kenneth Belling, for petitioners-appellants.

David J. Cannon, U. S. Atty., Robert J. Lerner, Special Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before KILEY and CUMMINGS, Circuit Judges, and WILL, District Judge.

WILL, District Judge.[1]

Appellants Kenneth Belling, Smith F. Brandom and Michael Gilboy, were indicted on a number of individual counts under 18 U.S.C. § 1341 for unlawfully using the mails to defraud and on a single conspiracy count. The indictment charged appellants with devising a scheme to defraud persons desirous of obtaining insurance coverage in an established, financially sound, mutual insurance company, by misrepresenting the financial condition of that company to policy holders and others. The government also charged specific fraudulent acts which related to defendant-appellants' management of Market Mens Mutual Insurance Company by virtue of their control of Market Mens Management Agency. Defendants were tried by a jury and found guilty.[2] Prison terms were not imposed on any defendant. Instead, all defendants were fined and placed on probation.[3]

---

1. Judge Will is sitting by designation from the District Court for the Northern District of Illinois, Eastern Division.

2. The indictment containing 18 counts charged Michael Gilboy with 8 counts of mail fraud and 1 count of conspiracy. Co-defendants Brandom and Belling were charged with 17 counts of mail fraud and 1 count of conspiracy. On defendants' motion, the trial court dismissed the conspiracy count. as to all defendants, 4 counts of mail fraud as to Gilboy, i. e., counts 3, 4, 5 and 7, and 5 of the 17 mail fraud counts as to Brandom and Belling, i. e., counts 3, 4, 5, 7 and 11. The jury found Gilboy guilty on counts 1, 2, 6 and 8, and Brandom and Belling guilty on counts 1, 2, 6, 8, 9, 10, 12, 13, 15, 16 and 17, and not guilty on Count 14.

3. Defendant Gilboy was fined $2,400 and placed on probation for 18 months. Defendant Belling was fined $4,000 and

The factual background is briefly as follows. Market Mens Mutual Insurance Company (Mutual) was at all relevant times a Wisconsin mutual insurance company, organized in 1917 and licensed to do business in some thirteen middle-western states. By 1958, Mutual was in a seriously impaired financial condition. In December of that year, four individuals, with the consent of the Wisconsin Insurance Department, formed Market Mens Management Agency (Management) in order to refinance and manage Mutual. Management was formed by appellant Gilboy and three other Milwaukeeans: Lamonte Fonteine, a senior partner of Fonteine, McCurdy and Co., Milwaukee's largest independent certified public accounting firm; Phillip Fox, an attorney; and Milton Polland, a principal in several insurance companies. These men, through Management, purchased $300,000 of Mutual's surplus notes.

With the approval of the boards of both companies, Gilboy became the president of both Mutual and Management. Management's income was to be a stipulated fee of 38 per cent, later 39 per cent, of earned gross premiums of Mutual. The execution of the management contract was part of a plan for the rehabilitation of Mutual and it provided that Management was to be responsible for conducting the business of Mutual and providing all necessary facilities and personnel. Excepted from Management's obligations were the payments of claims losses, adjustment expenses, interest on loans and taxes.

Two years later, in October 1960, 100 per cent of Management's stock was sold to Merchant's Management Corporation (Merchants), an Illinois corporation. This sale was consummated with full disclosure to the Wisconsin Insurance Commission. Defendant Brandom controlled Merchants and initiated the purchase. Gilboy, while indicating a willingness to sell, agreed to do so only upon condition that he would be permitted to retain his positions with Mutual and Management. Subsequent to the sale to Merchants, appellant Gilboy remained as president of both Mutual and Management until his resignation on December 31, 1961. Also, in October 1960, appellant Belling was brought in by Brandom to assist Gilboy.

At the time of the October sale, the attorney for Merchants raised questions as to Mutual's financial picture with Brandom. The chief accountant for Mutual and Management indicated to Gilboy, prior to the sale to Merchants, that Mutual's records suggested that the loss reserves were inadequate. On December 14, 1960, shortly after Merchants acquired Management, Gilboy, at the suggestion of counsel, wrote to the Wisconsin Commissioner of Insurance requesting permission to increase Mutual's surplus through sale of an additional $500,-000 of Mutual's surplus notes to Management. That permission was denied.[4]

In February 1961, Mutual filed with the Department of Insurance, as required by Wisconsin law, an annual statement reflecting its financial condition as of December 31, 1960. In September of 1961, prior to the filing of the annual statement, a regularly scheduled zone examination of Mutual was initiated by the insurance departments of Wisconsin, Minnesota and Missouri. This examination revealed that Mutual's surplus as of September 30, 1961, was $58,448, whereas the required surplus fund for Mutual, as determined by the examiner, was $450,000. Although the officers of

placed on probation for 2½ years. Defendant Brandom was fined $11,000 and placed on probation for a period of 4 years.

4. Surplus notes have a direct and immediate effect on surplus, increasing it to the extent of the note. See Record pp. 1043–46, 1491–97; and Belling's exhibit 35. In early 1961, appellant Gilboy and other company representatives requested and were given another opportunity to meet with the Commissioner for the purpose of securing their approval of the additional $500,000 worth of financing. Such approval was again refused.

Management and Mutual did not agree with the opinions of the zone examiners, certain steps were then initiated by the officers, including appellants' herein, to correct the alleged deficiency. These steps form part of the substantive basis for the indictment and convictions of defendants under 18 U.S.C. § 1341.

Before filing the 1960 annual report, Gilboy was advised by an independent firm that an overall excess loss reserve of about $232,000 existed as of December 27, 1960. This recommendation was in part made by the same firm, retained by Brandom, which had, prior to the October sale to Merchants, indicated concern over the adequacy of the loss reserves.

The 1960 annual statement of Mutual included among its assets real property at 3134–38 Broadway, Kansas City, Missouri, carried at $150,000. The property had been purchased by Mutual in December of 1960, after the zone examination, for $109,000. Testimony at the trial indicated conflicting opinions as to the true value of the property. One appraisal made in 1960 appraised the property upwards of $150,000. This 1960 appraisal was submitted to the controller of the company. Ralph Johnson, who, without consulting Gilboy, used the $150,000 figure in arriving at the fair market value and placed that fair market value, $150,000, in the admitted assets column of the 1960 Annual Statement. At the time the report was filed it was proper, as a matter of law for a Wisconsin insurance company, to place property in its Annual Statement at its fair market value.[5]

A later appraisal on August 13, 1962, valued the property around $66,000. Ultimately, upon liquidation of the property in 1962, it was sold for $61,000.

That 1960 statement also listed as assets certain Wilson Auto Leasing Co.

debentures at $100,000. These debentures were acquired by Mutual in December 1960, in a transaction by which Mutual sold furniture and fixtures to Wilson in exchange for the debentures. The indictment charges in Count I that the defendant * * * "included in said statement as assets certain corporate debentures of Wilson Auto Leasing Company of Chicago, at a value of $100,-000, said defendants well knowing the debentures were not admissible assets under the laws of the State of Wisconsin." This allegation stems from the zone examination of September 30, 1961 in which the examiners concluded that the Wilson Auto Leasing debentures were not admissible assets under the laws of Wisconsin.[6] Under Wisconsin law, fixtures and furniture may not be included on a balance sheet as an admitted asset. However, debentures may be so listed. With respect to this transaction, the government contended that the conversion to debentures constituted a subterfuge and a fraud as to the mutual polify holders because it improperly increased the admitted asset value of Mutual on its 1960 statement.

On November 1, 1961, the Wisconsin Insurance Department circulated a letter among some thirteen states. The import of this letter was that the financial condition of Mutual was impaired. This communique caused the other states in which Mutual was licensed to do business to issue cease and desist orders against Mutual requiring its agents to refrain from writing business and forwarding premiums. In December of 1961, the directors of Mutual, through counsel, the state Attorney General and the Wisconsin Insurance Commissioner agreed that Mutual could improve its position through reinsurance.

In late 1961, Belling and Gilboy were advised by the Wisconsin Insurance De-

---

5. See the trial transcript pp. 1420–23, 1449–50, 1490–91, 2210 and 2615–21.

6. See Government exhibit 3B at page 25 which adopts the position that on the basis of available information these de-

benture notes were of questionable value and did not appear to be proper investments under Wisconsin laws. (Reports of the Association Examination of Market Mens Mutual Insurance Company, September 30, 1961.)

partment of certain preliminary findings which indicated that an impaired surplus existed on or about November 1, 1961. As a result of these findings, a meeting was held between Brandom, Belling, and the Wisconsin Insurance Department to consider the financial condition of Mutual and Management. This meeting was held on January 24, 1962. Its purpose was to obtain approval of various reinsurance contracts and to gain approval of additional steps to be taken by the directors of the Mutual.[7] These actions were approved, albeit prematurely, on January 24, 1962, and the reinsurance treaties were approved on the same date in a letter sent out by the Commissioner of Insurance to the various states. This letter indicated that Mutual's financial condition had been approved. Also at the January 24 meeting, both Gilboy's departure and the filing of the annual report for 1961 were noticed to the Commission. The 1961 annual report contained substantially all of the items which had been approved by the Wisconsin Insurance Department. The report indicated that Management owed Mutual $55,000.

Appellant Brandom became the Assistant Vice President of Management in November of 1961. He was neither a capable nor experienced insurance man and, as a result of Gilboy's departure on December 31, the company lacked experienced management. Once into 1962, the new management was unable to raise the premium income to its previous level and, consequently, Mutual never recovered its prior position even though the steps approved by the Insurance Commissioner had been taken. In March of 1962, new buyers for all of Management's stock owned by Merchants were procured and a sale thereof was made. The new purchasers apparently took no action to restore Mutual to a sound financial condition and it was put into receivership by means of an involuntary bankruptcy petition and adjudicated a bankrupt on May 28, 1962.

Appellants have requested this Court to set aside their convictions on all counts and enter a judgment of not guilty or, in the alternative, grant new trials. To support their request they argue that 1) the government made an improper reference to the function of the Grand Jury in its opening statement and that this statement prejudiced their cause; 2) there was a fatal variance between the alleged crime or crimes and those actually proven by the evidence; 3) the trial was so complex as to prejudice the individual defendants once the conspiracy count was dismissed; 4) appellants should have been granted a severance and awarded separate trials after the conspiracy count was dismissed; 5) the trial judge erred in that an unsigned, undated, hearsay letter was introduced into evidence and that this hearsay evidence was sufficiently prejudicial to prevent the defendants from obtaining a fair, impartial trial; 6) the United States Attorney because of his allegedly highly prejudicial and broad misstatements in closing argument as to what the evidence showed was guilty of flagrant misconduct, and 7) the Court's instructions to the jury were unfair and thereby prevented the jury from a proper deliberation.

■ Initially, all appellants contend that a severance under Rule 8(b) of the Federal Rules of Criminal Procedure should have been granted after the conspiracy count was dismissed because defendant Gilboy was not charged in all counts of the indictment. The indictment does charge that these defendants " * * * participated in the same act or transaction or in the same series of

---

7. The various steps taken by Mutual included reinsurance of some business, the sale of some real estate and the sale of the Wilson Auto Leasing debentures to Management for cash and a promissory note. The total purchase price of the approved debenture transaction was $79,995 payable as follows: $50,000 in cash and a promissory note for $29,995.

acts or transactions." Rule 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Thus, under the Rule, the fact that Gilboy was not charged in counts 9 through 17 affords no basis for a mandatory severance and no prejudice resulted to either Brandom or Belling from the trial judge's discretionary refusal to order a severance.

■ Likewise, the fact that the trial court dismissed the conspiracy count, without more, does not establish a misjoinder. *See,* Stern v. United States, 409 F.2d 819 (C.A. 2, 1969). The Second Circuit there held that, where the original joinder of defendants was proper, a dismissal of a conspiracy count requires granting of individual trials on the substantive counts only if it appears that the defendants would be prejudiced by continued joinder, 18 U.S.C. §§ 286, 287.

Moreover, absent any allegation or evidence of bad faith in bringing the conspiracy count, we are obliged to assume that the indictment was sought with the reasonable expectation that sufficient proof of conspiracy would be forthcoming at the trial. United States v. Aiken, 373 F.2d 294, 299 (C.A. 2, 1967). Sufficient basis is present here to preclude any finding of bad faith. Evidence did exist of a common business relationship between all the defendants; the record indicates that joint meetings were held between appellants Brandom, Belling and Gilboy; and the testimony of several government witnesses could be construed as an indication of a joint endeavor by the appellants.

■ Assuming the propriety of the original joinder, dismissal of the conspiracy count requires independent trials only if the trial court is satisfied that a defendant or defendants would be or were prejudiced by the joinder. Schaffer v. United States, 362 U.S. 511, 514, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). The trial court found no such prejudice.

Appellants have also argued that the interspersal of proof against one defendant, admissible if at all as to others only because of the conspiracy count, made it impossible for the jury to marshall the independently admissible evidence as to each of them. A thorough examination of the record does not sustain their contention.

The record indicates that the jury could have concluded beyond a reasonable doubt that appellants were guilty of the remaining counts in the indictment. Certainly, the record reveals an absence, rather than the presence of any prejudicial joinder. The trial court was, throughout the long trial, careful to point out to the jury that certain testimony was to be considered only against the defendant to whom it directly related and not to any of the others. Despite the protestations of the appellants that the complexity and the limited admissibility of various items of evidence required independent trials, the careful limiting instructions of the trial judge prevented any prejudicial joinder.

In this connection, we note that only defendant Belling moved to sever before trial. Defendant Gilboy moved for a severance at the end of the second week of the trial. The trial court denied Gilboy's motion to sever, but sustained his hearsay objection to the proffered evidence which was alleged as the basis for the motion to sever. The third defendant, Brandom, never requested a severance. Moreover, there is no indication that the jury was unable to comprehend the evidence or was in any other way confused. This is corroborated by the fact that the jury acquitted both Brandom and Belling on one of the re-

maining counts. *See,* United States v. Hutul, 416 F.2d 607 (C.A. 7, 1969).

Appellant Gilboy has separately urged that the joint trial made a fair trial for himself impossible and that his Rule 14 motion to sever ought to have been granted. He argues that the complexity of the case, the inclusion of the conspiracy count, its subsequent dismissal, the extent of the evidence admissible as to one but not to all, and the manner of presentation by the prosecution made a fair trial impossible. Gilboy contends that this problem is graphically apparent in the final argument of the prosecution.

■ We agree with Gilboy that in his closing argument the prosecutor made no attempt to segregate the evidence as to each defendant. In addition, he referred to excluded testimony. We conclude that the prosecutor clearly overstated and misstated the evidence. Still, this does not of itself constitute reversible error. Closing arguments purport neither to be the evidence nor a precise summation thereof. Rather, in closing argument each advocate seeks to convey to the jury his position as to what conclusions should be drawn from the evidence as he recollects it. It is the jury's responsibility alone to determine what the evidence is and to make its determination as to guilt or innocence therefrom. The fact that the prosecutor's closing argument was inaccurate did not of itself create prejudicial error here. *See,* United States v. Achilli, 234 F.2d 797 (C.A. 7, 1956), and United States v. Hoffman, 415 F.2d 14 (C.A. 7, 1969).

Appellants' third argument, that their case was prejudiced because of the opening remarks of the Assistant United States Attorney, is also insufficient to require reversal. They maintain that his statement to the jury concerning the Grand Jury's return of the indictment was reversible error. In support of their position, appellants have cited Weaver v. United States, 379 F.2d 799, 802 (C.A. 8, 1967). The Court there stated, "We have no doubt that the statement * * * is improper." But it

went on to hold that the specific reference to the Grand Jury proceedings was not so prejudicial as to require a new trial.

■ In the instant case, appellants made timely objection to the prosecution's statement, the District Judge considered their objection and ruled for the Government. While the prosecutor's summary was hardly a classic description of the Grand Jury's role, and we believe it inappropriate for a prosecutor to attempt in opening argument to educate the trial jury on the nature of Grand Jury proceedings, we agree with the trial judge that the comments in question were not prejudicial. Moreover, in his instructions, the trial judge correctly informed the jury as to the limited nature of the Grand Jury's role and the fact that the return of an indictment is no evidence of guilt. Accordingly, we conclude that the reference to the Grand Jury in the Government's opening statement, while unfortunate and inappropriate, was at most harmless error. *See,* Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ Another contention which all appellants have raised is that there was a fatal variance between the alleged crimes as set forth in the indictment and those which were proven by the evidence adduced by the Government. Defendants Brandom and Gilboy, at the close of the trial, contended that a defective and prejudicial variance existed between the charges in the indictment and the proof offered and received in support thereof. The trial judge apparently did not specifically rule on this contention. Suffice it to say, that it is unnecessary for the prosecution to prove beyond a reasonable doubt every factual allegation set out in the indictment. The conviction must be sustained if there is sufficient proof on each count upon which a jury might find the guilt of the defendants beyond a reasonable doubt. *See,* Schaefer v. United States, 265 F.2d 750 (C.A. 8, 1959). Such proof exists here.

Equally unpersuasive is appellant's argument that the reading into evidence of the contents of an unsigned letter was hearsay and prejudicial. It is appellant Brandom's contention that this is one of the most prejudicial aspects of the entire record. The alleged prejudicial hearsay evidence is as follows:

Reviewed our file at time when we had grapevine inflow that some unsavory characters from Kansas were attempting to get into Market Mens Mutual. The Kansas Department had heard such a rumor and stated that if these individuals had purchased control of Market Mens Mutual it would have been a matter of serious concern of our department.

At the time this evidence was offered, appellants moved for a mistrial and for exclusion of the evidence on the grounds of hearsay. The trial court overruled both motions. The document which was being read by the witness was a document which had already been introduced into evidence by defendant Belling. Although its introduction was disavowed by the other defendants, portions of it were used extensively by Belling's defense counsel. Accordingly, the judge permitted the Government access to the entire exhibit.

■■ Since the document in question, Belling's exhibit 5, was used extensively by both sides, Scott v. United States, 263 F.2d 398 (C.A.5, 1959), which held that where certain statements were so prejudicial and inflammatory that no amount of caution or instruction could eradicate the impression of the testimony from the jurors' minds, is distinguishable. We cannot, in light of the entire record, agree with appellants that this evidence was introduced by the prosecution for the sole purpose of inflaming the jury. The evidence was part and parcel of the Wisconsin Insurance Department's examination work papers of Mutual as of September 30, 1961, and was relevant to the entire scope of that examination. Inflammatory, irrelevant evidence is improper and inadmissible.

Under appropriate circumstances, its admission may constitute reversible error. The admission of this statement, when considered within its evidentiary ambit, was not reversible error.

Finally, all appellants urge a reversal, or, in the alternative, a new trial on the ground that the instructions to the jury were so unfair as to prevent them from obtaining a fair and impartial determination of their guilt or innocence. They argue that the instructions as given were misleading, confusing and so unclear as to prevent the jury from intelligently disposing of the issues.

Specifically, appellants' objections run to two separate charges. The first concerns reasonable doubt and was as follows: "If the jury finds that a defendant is guilty beyond a reasonable doubt of any one of the crimes charged in the indictment, a verdict of guilty should be returned as to him."

■ Defendants contend that this statement can be interpreted to mean that if the jury finds a defendant guilty of just one of the charges in the indictment, then they have the duty of finding the same defendant guilty of all the charges in the indictment. While the instruction could be more precise, we do not agree with appellants' interpretation of its import in light of all the trial judge's instructions, nor that the jury was misled. In view of the fact that they acquitted both Brandom and Belling on one count, it is clear that the jury understood the instruction to apply to each count separately. Moreover, the objection which appellants now raise was never raised in the trial court.

■ Appellant Gilboy, in the same vein, also argues that the trial court failed to charge the jury on its responsibility to consider each defendant's case as a separate and distinct entity. While his legal position is correct, it is untenable here, as the trial judge instructed the jury that the defendants had been charged with separate crimes in the various counts of the indictment and that they should give separate considera-

tion and render separate verdicts with respect to each defendant on each count. Specifically the court charged:

> Each defendant is entitled to have his guilt or innocence as to each of the crimes charged determined from his own conduct and from the evidence which applies to him, as if he were being tried alone. The guilt or innocence of any one defendant of any of the crimes charged should not influence the jury's verdicts respecting the other defendants. They may find any one or more of the defendants guilty or not guilty * * *. Nevertheless, you must relate the evidence only as to that defendant or those defendants toward whom it was received. * * * And in any event, you must determine the guilt of the defendant as to each separate charge by giving separate consideration to the evidence which applies to him as to each count.

The language is clear, the instruction correct, and appellant Gilboy was not prejudiced thereby.

Appellant Brandom argues that prejudice ensued from the court's instruction which urged the jury to deliberate with a disposition to be convinced. The instruction in question was as follows:

> The verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of others. You should examine the evidence and the several forms of verdict which will be submitted to you with proper regard and deference for the opinions of your fellow jurors. You should listen to each other's opinions with a disposition to be convinced. It is your duty to decide this case if you can conscientiously do so. If you fail to agree on the verdict the case is left open and undecided and like all cases, it must be disposed of some time. If the case is retried, a future jury must be selected in the same manner and from the same source as you have been chosen, and there is no reason to believe that the case would every [sic] be submitted to 12 men or women more competent to decide this case than those of

you who compose the present jury. There is no reason to believe that there will be more or clearer evidence produced at a future trial. Therefore, I urge you to deliberate in this case with the disposition to be convinced, at the time directing you that your verdict must be the conscientious decision of each individual juror.

This Court has, on an earlier occasion, examined substantially similar language. *See* United States v. Brown, 411 F.2d 930 (C.A. 7, 1969). That case raised the question of whether or not the trial court erred in giving the "so-called" Allen charge in a supplemental charge to a jury which was in disagreement. In *Brown,* the court held that the defendant failed to show that the supplemental charge was sufficiently prejudicial to warrant reversal. In the instant case, the instruction in question was part of the trial court's general instruction. Even more than in *Brown* the instruction here, given before this Court's decision in *Brown,* contains insufficient interference with the jury's free deliberations so as to have created a prejudicial atmosphere.

We reaffirm the position taken in *Brown,* that the Allen-type charge may contain elements of potential coercion and is in conflict with the American Bar Association's recommended instruction. Accordingly, we reaffirm the future use by the District Courts of this Circuit of the standards and practices set out in *Brown.*

In addition to the foregoing, Gilboy also urges that the evidence which was admissible as to him was insufficient as a matter of law to support a guilty verdict. Normally, an appellate court will not substitute its judgment for that of the jury or trial judge since, under our system of justice, they alone have the responsibility of weighing the evidence. If the evidence, when weighed most favorably from the Government's point of view is sufficient to sustain a conviction, the verdict must be affirmed. *See,* Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680

(1942) and Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict. *Cf.* Glasser v. United States, *supra,* 315 U.S. at p. 80, 62 S.Ct. 457.

The mail fraud counts in the indictment against appellant Gilboy on which he was found guilty center primarily on (a) the annual financial statement of Mutual as of December 31, 1960, and (b) matters relating to the internal operation of Management. The indictment charges Gilboy with knowingly filing or causing to be filed with the Insurance Department of Wisconsin a financial statement which falsely and inaccurately represented the financial condition by understating reserves and overstating the value of certain property and debentures held as corporate assets.

With respect to whether or not Gilboy, knowingly or intentionally participated in the preparation and filing of a false financial statement on the condition of Mutual as of December 31, 1960, the evidence admissible against him reveals that he had been informed on one or more occasions that the loss reserves were inadequate. It is uncontested that these reserves were substantially inadequate at the time Gilboy's group came into the Mutual picture and at all times thereafter. It is also clear that Gilboy, though the chief executive officer of both Mutual and Management, did nothing to increase the reserves to an adequate level. The jury might quite properly have inferred that, at the time he signed and participated in the filing of the 1960 annual report, he knew that the loss reserves as therein set out were improper under the existing applicable laws and regulations. At the very least, the evidence permits the inference that Gilboy knew or should have known that the reserves were too low and did nothing to cause them to be increased.

The indictment further charges Gilboy with intentionally overvaluing or knowingly participating in the overvaluation of certain company realty. Mutual purchased realty in Kansas City in December of 1960 for approximately $109,000, and the balance sheet as of December 31, 1960 valued the same property at $150,000. The Government introduced evidence from which the jury could have concluded that the $41,000 differential between cost and appraised value represented an inflated value which was intended to create the appearance of an increase in the net asset value of the insurance company.

Gilboy's actions in regard to the loss reserves, the Kansas City real estate, and the debentures of Wilson Auto Leasing Company carried as corporate assets, are comparable to the type of "reckless" conduct which this Court has, on another occasion, held violates the mail fraud statute. United States v. Meyer, 359 F.2d 837 (C.A. 7, 1966). In the instant case, the evidence, although not as substantial as in *Meyer,* was sufficient to permit the jury to conclude that Gilboy either knew the true facts or could have ascertained them by the exercise of that degree of care expected from a reasonably prudent corporate president.

The jury in *Meyer* was instructed that the defendant's asserted ignorance of the falsity of his representations to prospective investors could not be excused if he could have ascertained the true facts by the exercise of that degree of care expected of a reasonably prudent person. That instruction is equally appropriate here. Weighing the evidence most favorably for the Government, as we must, we hold that the jury had sufficient evidence to find appellant Gilboy guilty.

Because the trial court found no conspiracy, whether or not the record discloses a sufficient basis upon which to find that the other defendants caused an inflated, artificial appraisal to be entered upon the company books for an illegal purpose, is irrelevant as to Gilboy. His culpability must be determined solely by the evidence presented against him. To that end we have considered (a) evidence which indicated that Gilboy

knew of or had repeatedly been made aware of the understated reserves; (b) the fact that as president and chief executive officer of the two companies, he had a duty to the policy holders to determine whether or not the claim reserves were in fact adequate once the possibility that they were not was brought to his attention; and (c) the fact that he permitted recently acquired real estate to be carried on the books and in the company's annual report at 40 per cent more than its cost without apparently making any effort to determine whether or not a purported appraisal of the properties was misleading or arbitrarily high. In the face of such evidence, we conclude that the jury could properly have found that Gilboy either knew or should have known that the annual report was false and misleading at the time he signed it.

The record is also sufficient to warrant the jury's finding that the Wilson Auto Leasing Company debenture transaction was initiated with a fraudulent intent on the part of all concerned, including Gilboy. We recognize that, at the time the 1960 annual report was filed, appellant might have assumed that a conversion of otherwise non-admitted assets to debentures was proper, since, under Wisconsin insurance law, although furniture and fixtures may not be included on an insurance company balance sheet as admitted assets, debentures may be so listed. The Government argues, and the record supports the inference, that the conversion of "non-admitted" assets to debentures here was intended to deceive the mutual policy holders by improperly increasing the admitted assets of the company on the 1960 annual statement. Notwithstanding the fact that Mr. Juranek, the State Insurance Examiner in charge and Mr. DuRose, also of the Wisconsin Insurance Department both testified on cross, that such a transaction was not *per se* improper, the jury could have concluded that, under all the circumstances, the transaction was intended solely to falsely increase the admitted assets of the company.

The sufficiency demonstrated above is equally applicable to appellant Gilboy's internal transactions with Management, counts 2, 6 and 8 of the indictment. Counts 2, 6 and 8 incorporate by reference all the allegations of count 1, and allege additional specific acts of mail fraud. Because these counts involve integral elements of the count 1 scheme, the record is sufficient to affirm the jury's determination that appellant Gilboy was guilty as charged.

Although the record is less than clear as to what Gilboy's role was, the inference could properly have been made that, because of his position as president of both companies, he had to have been aware of certain internal irregularities within the companies he headed and that a reasonably prudent president would have done more to ascertain the true facts and taken steps to correct them. One could argue that Gilboy was seeking to save a financially failing insurance company and that he believed that the steps were necessary and proper in order to accomplish this purpose. The issue, of course, is whether or not he exceeded lawful propriety in his efforts. The jury concluded that he did.

We emphasize that the touchstone of our review is whether or not a jury could have so concluded. Whether or not we would have found the evidence sufficient is irrelevant. We hold, therefore, that the jury had sufficient evidence to conclude beyond a reasonable doubt that Gilboy was guilty as charged.

The judgment of the District Court is affirmed.