UNITED STATES of America, Plaintiff-Appellee,

v.

Howard TUCKER, Defendant-Appellant.

No. 76-1329.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1976.

Decided April 4, 1977.

Charles O. Brizius, Chicago, Ill, for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Patricia W. Lemley, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before MOORE, Senior Circuit Judge,[*] and PELL, and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Appellant Howard Tucker was indicted for knowingly and intentionally distributing heroin on October 4, 1974, in violation of 21 U.S.C. § 841(a)(1), and was convicted in a bench trial in the district court. His post-trial motion for acquittal was denied and he was placed on probation for a period of five years. Tucker's appeal attacks the judgment of conviction and the "sentence" imposed [1] as well as the denial of his post-trial motion. At issue are the applicability, extent, and consequences of a constitutional right of a criminal defendant to disclosure of the identity of a confidential informer of the Government, and the evidentiary rule that if a party has it peculiarly within his power to produce a witness whose testimony would materially elucidate a transaction in question, the failure to produce the witness at trial permits an inference that the witness would testify unfavorably to the party.

For the purposes of this appeal, there is ample evidence in the record to support the trial judge's conclusion that at or about 5:00 p. m. on October 4, 1974, Yvonne Williams, Tucker's co-defendant, sold approximately one ounce of heroin to Special Agent Kenneth Adams of the Drug Enforcement Administration for $1400. Tucker did not contest this evidence at trial, and he does not attack its sufficiency here.

■ Tucker's theory of defense was and is that he was not involved with this drug transaction. With reference thereto, he points out the uncontested facts that he was not at the scene of the transaction, and that there is no evidence that he received any of the proceeds of the sale. There was, in fact, some evidence that he did not receive any proceeds.[2] The Government's theory of criminality is that Tucker knowingly set up the sale by introducing Adams, whom he knew to be a desirous buyer, to Williams, whom he knew to be a willing source, for the purpose of facilitating a transaction between the two. Tucker denies this. If proven, this theory would sustain the conviction, because of 18 U.S.C. § 2(a), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Section 2(a) need not be specifically pleaded, and a defendant indicted for the substantive offense may be convicted as an aider and abettor, upon proper proof, so long as no unfair surprise results from conviction on the latter theory. *United States v. Adams*, 454 F.2d 1357, 1358–59 (7th Cir. 1972), *cert. denied*, 405 U.S. 1072, 92 S.Ct. 1523, 31 L.Ed.2d 805; *Levine v. United States*, 430 F.2d 641, 642–43 (7th Cir. 1970), *cert. denied*, 401 U.S. 949, 91 S.Ct. 962, 28 L.Ed.2d 232 (1971). No such unfairness was present here, and Tucker asserts no objections on this point.

The critical factual issue at trial was the precise nature of the interactions of Adams and Tucker on October 4 between approximately 2:00 p. m., when they first met, and shortly after 5:00 p. m., by which time the sale in question had been completed. The testimony on this point clashed sharply. Adams testified that he arrived at 2:00 p. m. at an apartment at 6920 South Crandon, in Chicago, by pre-arrangement with a confidential informer, to meet the informer and be introduced to a heroin source. When he arrived, the informer, Tucker, and one Seville Yearby were present. Adams further stated that his informer indicated Tucker as the person they had previously discussed and that he (Adams) and Tucker then discussed price and quality for the purchase of an ounce of heroin. Tucker

* Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

1. Strictly speaking, the imposition of sentence was withheld and a term of probation was imposed in lieu thereof.

2. Agent Adams testified that he paid the same price for an ounce of heroin in a later transaction directly with Williams that he had paid on October 4, when Tucker was allegedly a middleman.

then telephoned his source, addressing her as "Yvonne," and stated that his people were with him and ready to buy an ounce of heroin. Soon thereafter, Tucker, Adams, the informer, and Yearby all left the apartment. Yearby went his own way, and it is undisputed that neither the Government nor the defense have since been able to locate him. Tucker, Adams, and the informer then proceeded to 6806 South Merrill, Chicago, where Tucker led the other two to a third-floor apartment and into a bedroom and introduced them to Yvonne Williams. She said she was still trying to reach her source and that it would be probably another twenty minutes before she could do so. Adams suggested that he would leave and tend to personal business for an hour or so, and would return then, and Williams agreed. According to Adams, Tucker was present throughout this conversation. Adams and the informer then left the apartment, made contact with surveillance units assigned to the investigation, and returned at about 3:55 p. m. Williams and Adams then left the apartment, consummated the sale, and returned shortly after 5:00 p. m. Williams had a short whispered conversation with Tucker, and then Adams, Tucker, and the informer left the apartment. Upon reaching the street, Tucker stated that he was going to see another friend who dealt in heroin and he went his own way.

Tucker's testimonial version of the events of this period paints quite a different picture. October 4, 1974, was a day off for him from his job with the Department of Environmental Control for the City of Chicago, and he was engaged that day in duties for the Democratic Party, canvassing to encourage voter registration for the upcoming congressional elections. The apartment building at 6920 South Crandon was a part of his assigned territory, and he had been canvassing door-to-door there when he arrived at the sixth floor apartment in which he later met Adams. His knock at that door was answered by an old slight acquaintance known to him only as Gene, who, it develops, was the confidential informer to whom reference has previously been made.

The two men chatted briefly, and Gene invited Tucker into the apartment. Thus, if Tucker's testimony is true, he came to the apartment in the course of political duties and entered it at the invitation of an acquaintance coincidentally encountered, *not* by prearrangement to transact drug-related business.

Once inside the apartment, Tucker testified, he was introduced to Seville Yearby. Gene and Yearby were engaged in a drug-related conversation. Gene was interested in purchasing an ounce of heroin, and Yearby had a small sample of the drug he could obtain for Gene. During these negotiations, Tucker went to the telephone and called Ann Miles, a woman with whom he had lived previously, and by whom he had had a daughter out of wedlock. Miles was in the process of moving, and was staying temporarily with her friend, Yvonne Williams. Tucker had been given the phone number when he met Miles three days previously. He called to say he would shortly bring fifty dollars to Miles for their daughter. She told him the apartment was at 68th and Merrill Streets. Overhearing background noise, Tucker remarked that it sounded like a party was going on at the other end of the line. At this point, Gene asked to speak to Miles and took the phone. Tucker said Miles had previously met Gene through one Mildred Howard, who had also introduced him to Gene. Miles' testimony confirmed this. Tucker heard Gene ask about how many young ladies were present at the apartment Miles was at, but did not hear the balance of the conversation, as he had returned to his seat. Soon after this telephone call, Tucker observed Gene making another call, after which Gene told Yearby that his partner was coming over. Sometime later, Kenneth Adams arrived and joined in the drug-related conversation with Gene and Yearby. Adams directed inquiry to Tucker as to whether he could obtain better price or quality than Yearby was offering, but Tucker stated that he had not messed around with drugs for five years and could not help them. After a little while, Tucker called Miles again, to

say that he was on his way and to obtain a more specific address which he had neglected to get when Gene interrupted his earlier call. Tucker left the apartment with the others, and Gene suggested that Adams and he would go over to Miles' place with Tucker. Yearby did not remain with the other three after this point.

Arriving at the South Merrill address, Tucker, Adams, and Gene all went up to the Williams apartment, but Tucker testified that the jointness of their activities there ended at the door. He went to the bedroom briefly to say hello to Yvonne, and then returned with Miles to the living room, leaving Adams and Gene, who had followed him to the bedroom, to their own devices. He did not introduce either to Yvonne Williams, and neither heard nor participated in any drug-related conversations. He spent the next two hours or so playing with his daughter and talking with Miles. He noticed Adams and Gene re-entering the apartment about an hour after they had all arrived, but otherwise did not see them again until they were about to leave the apartment for the last time that day. Noting the time, he decided to go with them, parting company with them when they reached the street.

Tucker called Ann Miles to the stand. There were several minor although not necessarily insignificant discrepancies between her testimony and Tucker's, but basically she supported Tucker's version of those events of October 4, 1974, as to which she had knowledge. She testified, e. g., that Gene had come on the line during a telephone call with Tucker that afternoon, that he had asked about young ladies, and that she gave the line to one young lady to speak with him. She stated that Tucker came to the apartment at 6806 South Merrill to give her fifty dollars for their child, and that he did in fact do so. She stated also that she was with Tucker virtually the entire time he was at the apartment, and that she heard no drug-related conversations in which Tucker or anyone else took part.

Tucker, in short, denied all involvement in the October 4 heroin sale from Williams

to Adams, and he offered a witness to support his version of the events of that day, at least in part. To explain the apparently otherwise unlikely coincidence that two people he happened to encounter at 6920 South Crandon just happened to be en route to a drug transaction at the same apartment he was headed to, without his knowledge, he and his counsel articulated two theories at trial. First, Gene, in speaking with Miles or the other young lady he is said to have spoken with or perhaps yet another person, may have developed reason to believe that a heroin connection could be made at the apartment to which Tucker was headed, and Gene and Adams may have accompanied Tucker to the South Merrill address with this in mind. Alternatively, Gene and Adams may have done all that could be done with Yearby that day, and may have gone along with Tucker to the scene of a party simply to extend their networks of acquaintances and contacts for possible later use. Once there, under this theory, they followed up on the promising lead that developed. Agent Adams' testimony, as we have noted, was to a directly contradictory effect.

We have set out this testimonial material at some length, not because we conceive it to be our task to determine who the trial judge should have believed, but instead to delineate the precise factual issue presented at trial and to indicate the essentially one-on-one nature of the testimony presented pertinent thereto. The issues on this appeal revolve around Gene, the witness whose identity and whereabouts were never disclosed to the defense, who was never made available for questioning, and who was not called by the Government to testify. As is evident from our review of the testimony, Gene was present at all times when Tucker allegedly said or did the things on which his conviction is based. As the Government candidly conceded on oral argument here, the conviction could not have been obtained if testimony about conversations and actions which Gene had witnessed had been excluded. Moreover, in the absence of the elusive Mr. Yearby, who neither the Government nor the defense could locate,

Gene was in a unique position to shed light on the sharp factual controversy presented by Adams' and Tucker's testimony.

Recognizing the potential importance of the informer to the defense, defense counsel, in discovery motions and in open court in pre-trial proceedings, repeatedly asked the trial judge to compel the Government to disclose the informer's identity and whereabouts, or at least to make the informer available for an interview. The Government, as it conceded at oral argument, never made any showing of any danger to the informer that might result from disclosure. In pre-trial proceedings on October 28, 1975, the trial judge stated that Tucker was entitled to know the name of the informer, and directed the Government to "[g]et the mechanics set up" for an interview with defense counsel. In proceedings on November 11, 1975, the Government admitted that it had not complied, and sought reconsideration of the trial judge's directive. Because at that time it remained a possibility that Seville Yearby could be found, the trial judge deferred the matter of the informer disclosure. On December 1, 1975, the trial judge reminded the Government of its obligation to maximize efforts to find Yearby if it wished to keep the identity of its informer secret. Yearby, of course, was never located, and the matter stood thus when trial opened on February 12, 1976. Defense counsel raised the disclosure issue again before the trial began. Once again, the trial judge indicated that Tucker was entitled to identity disclosure. Discussion ensued, and the Government represented that the informer would not be called as a witness against Tucker. At this point, the trial judge made the following ruling:

MR. BRIZIUS [Defense Counsel]: Well, it is going to be the agent's word against my client's word, and we could disprove it with the confidential informant.

THE COURT: Well, more than that. You are entitled for me to assume that the confidential informant if he is not called would testify favorably to your client because he is known to the government and he is not known to you. So I don't think you need the confidential informant. You are better off not to have him, I think, because if the government doesn't call him, then you are entitled to have me assume that he would testify favorably to your client, at which point the government will never establish beyond a reasonable doubt that what the agent says is true and that what your client says is false because it will be in effect two witnesses against one. I think the government is going to have to call the informant or they are going to lose that issue.

MR. McQUEEN [Assistant United States Attorney]: What your Honor is saying, from the very outset—

THE COURT: I don't guarantee it because I haven't heard the evidence, but I would think that the probabilities are that if you have one-on-one contradictory testimony, and the government has a second witness who could clarify it, and they don't call that witness, I am then obligated to assume, as I would tell a jury, that they must draw the conclusion that that witness if called, would testify favorably to the defendant. That is the law, and rightly so.

During argument subsequent to the taking of evidence, the following exchange occurred:

MR. BRIZIUS: Yes, and without those situations, those essentials where the confidential informant was present, there would be no case against Mr. Tucker.

THE COURT: That is true.

MR. BRIZIUS: So having that happen, that—

THE COURT: Could have been corroborated by the confidential informant. No question. I said that before we started the trial, and I remain astounded the government has once again failed to produce the only corroborating witness it had to the essential aspects of the transaction.

I don't know what they expect juries or judges to do. I have seen them lose cases before because they didn't bring in a key witness who was available only to them,

and I can only conclude they have fears as to what such a key witness would testify to if they were to put him on the witness stand.

MR. BRIZIUS: Therefore, my guy has to go free.

THE COURT: Not so fast. That just adds some testimony on your side. That is all it does. We will just see how it all adds up.

How it all added up in this case was that the trial judge found Tucker's testimony unbelievable and materially inconsistent with that of Miles, and convicted him.

Tucker's principal argument on appeal is that the totality of these circumstances required the trial judge to grant Tucker's post-trial motion for a judgment of acquittal. In support of this argument, he cites authority establishing two distinct propositions, the relationship between which both Tucker and the trial judge seem to have misapprehended. We will address each in turn.

First, Tucker places substantial reliance on the due process doctrine articulated in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In that case, the Government had been allowed to withhold the identity of a confidential informer who had made the drug purchase for which the defendant, as seller, was convicted. Recognizing the important interests in effective law enforcement which are served by the Government's privilege to refuse to disclose the identity of those who report violations of law to appropriate officials, the Supreme Court found a limitation on the privilege in the fundamental requirements of fairness, and held that "[w]here

the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action." *Id.* at 60–61, 77 S.Ct. at 628 (footnotes omitted).

The Court in *Roviaro* declined to establish a fixed rule that disclosure would be required whenever it was demanded. Instead, the Court stated, the problem

calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62, 77 S.Ct. at 628.

■■■ We agree with Tucker that the balance in this case clearly demanded that the trial judge require the Government to choose between abandoning secrecy and dismissing the prosecution. The crime charged was a serious one, and the facts we have set out above amply demonstrate the vital importance of the informer's testimony to Tucker's unquestionably legitimate defense of noninvolvement. It is of course possible that the informer's version of the events of October 4 would have paralleled Adams' testimony and been of no help to Tucker, but on this record we are not free so to assume.[3] Conversely, of course, it is

---

**3.** The Government submitted, in camera, both to the trial court and to this court, a single page statement of "SI140141" which is represented to be the statement of the informer Gene pertinent to the events of October 4, 1974. The statement was voluntarily tendered to defense counsel during the trial. The un-cross-examined unsigned statement of an unidentified witness has no cognizably probative force, and accordingly we consider it irrelevant both to the *Roviaro* issue we are here discussing and to

Tucker's claim that the missing witness inference required a judgment of acquittal.

Although defense counsel did not object to the in camera submission to the trial court and reiterated on oral argument his confidence that the trial judge could and did separate out this statement from the evidence upon which the case was tried, we feel obliged to express our concern over the practice followed. This was a bench trial in which the events observed by the informer were the sole issue pertinent to the defendant. To inject into the trial judge's men-

not beyond a reasonable possibility that Gene's testimony would have fully corroborated that of Tucker, but that the trier of fact would have found Gene's testimony no more credible than he did that of Tucker. In any event, "[t]he desirability of calling [the informer] as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide." *Id.* at 64, 77 S.Ct. at 629.

The Government's attempts to distinguish *Roviaro* are unpersuasive. It suggests first that in *Roviaro* the informer was the only witness to the drug transaction in question and was thus "the most material witness there could be." But this assertion is unsupported by the facts of that case. Although only the informer and the defendant rode in the informer's car to the scene of the transaction as passengers, a Government agent was hidden in the trunk of the car, from whence he was able to overhear conversations between the informer and the defendant. Moreover, a surveillance unit followed the car and the officers within observed the defendant's conduct in getting out of the car, picking up a package and depositing it in the informer's car, and departing. One of the same officers immediately picked up the package to preserve the chain of custody. These Government personnel were all indisputably witnesses to the crime, and they all testified. We fail to see how Gene's possible testimony here is any less material than that of the informer in *Roviaro*.

■ The Government also argues, we think correctly, that implicit in *Roviaro* is a requirement that the defendant establish a real need for disclosure. As we have seen, however, the circumstances of this case amply demonstrate such a need, which was articulated with specificity, repeatedly, to

the district court. Each of the authorities relied upon by the Government is thus meaningfully distinguishable. *See United States v. Casiano*, 440 F.2d 1203 (2d Cir. 1971), *cert. denied*, 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (reasonable to assume defendant knew the informer; another available witness was not called by the defendant; informer did not even observe the incident most damaging to the defendant); *United States v. Russ*, 362 F.2d 843 (2d Cir. 1966), *cert. denied*, 385 U.S. 923, 87 S.Ct. 236, 17 L.Ed.2d 146 (informer was not present at the actual drug sale, and played no central role therein, although he was in the vicinity; credible evidence from two sources established the critical issue; defense counsel did not explain to trial judge why disclosure was sought); *United States v. Simonetti*, 326 F.2d 614 (2d Cir. 1964) (no indication of how the informer's testimony could have been anything more than at best cumulative).

■ The Government makes the related argument that Gene was equally available to Tucker as to the Government. If this were so, of course, it would make nonsense of the claim that the Government's refusal to disclose the informer's identity denied Tucker a fair trial. *See United States v. Casiano, supra; Smith v. United States*, 273 F.2d 462 (10th Cir. 1959) (en banc), *cert. denied*, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729 (1960). But the contention that Gene was available to Tucker is without support in the record. The apartment in which they met was not Gene's apartment, and a later attempt by Tucker to locate Gene through the resident of the apartment was unavailing. To be sure, Tucker stated that he had casually met Gene three times previous to that encounter, but he did not even know Gene's last name.[4] An address Tucker had been given

---

tal processes this un-cross-examined statement, at least where the Government's voluntary disclosure of the same rendered unnecessary any ruling from the judge pertinent thereto, without justification placed the judge in the difficult position of finding the facts as if he had heard nothing from the informer, when in fact he had read what was represented as the

informer's statement. *Cf. Gregg v. United States*, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969) (re: pre-sentence report).

4. At one point Tucker stated that he had been told the informer's last name was Johnson; the Government thereafter made an offer to prove in camera that this was not so.

by Gene was a false address. A subsequent inquiry of Mildred Howard, who had introduced Tucker to Gene, was apparently also fruitless. We think the trial judge's conclusion, after the taking of all the evidence, that Gene was available only to the Government was plainly correct.

 Because the rule of *Roviaro, supra,* applies with full force to this case, we have concluded that Tucker did not receive a fair trial. We are unable to see, however, how this conclusion advances Tucker's contention that he was entitled to a judgment of acquittal. "Error in the course of a prosecution resulting in conviction calls for the correction of the error, not the release of the accused." *Pollard v. United States,* 352 U.S. 354, 362, 77 S.Ct. 481, 486, 1 L.Ed.2d 393 (1957). Tucker's second argument for a judgment of acquittal, based on the evidentiary missing witness inference, remains to be considered. The point is that it must stand or fall on its own merits; the *Roviaro* due process violation present here adds nothing to the law of evidence, just as the trial judge's promise to decide the case with an obviously elusive evidentiary inference in mind was not an adequate substitute for the fair trial that informer disclosure would have guaranteed.

 Tuckers' evidentiary argument for a judgment of acquittal is based on the frequently cited statement of the Supreme Court in *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893):

> The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.

The *Graves* rule has evolved somewhat with time; it is now generally recognized that the rule authorizes a permissive inference, rather than creating a presumption, *see Burgess v. United States,* 142 U.S.App.D.C. 198, 440 F.2d 226, 233 n.10 (1970); 2 J. Wigmore, Evidence § 285, at 162 (3d ed. 1940). Like all sound inferences, the missing witness inference is rooted in notions of common sense, specifically that where a party fails to call an available witness with important and relevant knowledge, it may be that he has something to fear in the witness' testimony. The strength of the inference will, of course, vary with the facts of each case, depending on how natural it would be for the party to have called the witness but for some apprehension over his testimony. *See Burgess v. United States, supra,* 440 F.2d at 237 (Robinson, J., concurring); *United States v. Young,* 150 U.S. App.D.C. 98, 463 F.2d 934, 942–43 (1972). The role of the inference may, moreover, be a limited one; it has been stated, *e. g.,* that the missing witness inference may diminish the strength of the non-calling party's evidence and strengthen the opponent's evidence but does not have the force of independent direct evidence. *Burgess v. United States, supra,* 440 F.2d at 238 (Robinson, J., concurring); *Gafford v. Trans-Texas Airways,* 299 F.2d 60, 63 (6th Cir. 1962); *United States v. Roberson,* 233 F.2d 517, 519 (5th Cir. 1956).

 With these principles in mind, we have no difficulty in saying that the trial judge's declaration that the missing witness inference only added some evidence to Tucker's position, at worst, did not misstate the law to Tucker's prejudice. Because the trial judge made this statement of law only shortly before his appraisal of the evidence and verdict, we will assume that he rendered the verdict only after giving what he considered to be due weight to the inference. Viewed in this light, Tucker's argument for acquittal reduces itself to the assertion that the evidence before the district court was insufficient as a matter of law to sustain a conviction. In assessing this contention, we proceed from the basic premise that it is not our function to weigh evidence or determine the credibility of witnesses; if substantial evidence, taking the view most favorable to the Government, supports a conviction, an appellate court will not reverse it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Brandom v. United States,* 431 F.2d 1391,

1399–1400 (7th Cir. 1970), *cert. denied sub nom. Gilboy v. United States*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971). To take the view most favorable to the Government means that "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury [or judge] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Id.* at 1400.

▬ Whatever result we might have reached if appraising the evidence in this case de novo, we cannot say that acquittal was required as a matter of law. The testimony of Agent Adams, not meaningfully eroded by vigorous cross-examination, provided substantial evidence that Tucker knowingly set up a narcotics transaction between Williams and Adams. Tucker's testimony contradicted that of Adams, to be sure. The experienced trial judge, who had the opportunity to observe the witnesses, which opportunity we lack, found Tucker's testimony unbelievable. He determined that the probability that Adams and Gene, who Tucker just happened to meet at 6920 South Crandon, just happened to go with Tucker to 6806 South Merrill for reasons entirely different than his, all without his knowledge, was so small as to vitiate Tucker's credibility. The trial judge also gave weight to the not insignificant contradictions between Tucker and Miles and to Tucker's reactions to them as they developed in the course of Miles' testimony. Such a weighing of evidence and credibility is peculiarly within the province of the trier of fact.

Nor does the missing witness inference, for what it is worth, compel a different conclusion. Surely the inference did not require the trial judge to assume that Gene, if he had testified, would have supported Tucker's story chapter and verse. The common sense notions underlying the inference required only the assumption that Gene's testimony "would not have been helpful" to the Government in proving its case, *see United States v. DiRe*, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948), or might have been harmful *in some way*. The trial judge

could permissibly have assumed that fear of a single contradiction in testimony otherwise parallel to Adams' motivated the Government not to call Gene, or even that the Government's fear, if any, concerned only a possible contradiction regarding a separate drug transaction also involved in the case against co-defendant Williams, in which Tucker was in no way involved. Viewing the evidence in the light most favorable to the Government, we cannot say that the limited weight of the missing witness inference reduced the force of the Government's evidence below the level necessary to sustain this conviction. The denial of Tucker's motion for a judgment of acquittal was not reversible error.

▬ It is thus clear that Tucker is not entitled to the only relief which he expressly sought before this court, an order directing the entry of judgment of acquittal. Because his notice of appeal in the case put in issue both the conviction and the denial of his acquittal motion, and because his counsel argued extensively from and relied on *Roviaro, supra*, as he had done repeatedly before the district court, we do not think justice would be served by denying to Tucker the new trial to which he is entitled merely because he made no express prayer therefor. *See* 28 U.S.C. § 2106. The judgment of the district court is accordingly reversed and remanded for proceedings consistent with this opinion.

REVERSED and REMANDED.

MOORE, Circuit Judge (dissenting):

I dissent. Had this case been submitted to a jury on the record before us and a guilty verdict been returned, there is little doubt in my mind that an affirmance would have been in order.

The only appellate issue now before us is whether the Government improperly refused to disclose the identity of a confidential informant for the trial. The majority find that the trial judge's conclusion "that Gene [the informant] was available only to the Government was plainly correct". *Supra,* at 210. Then, on the basis of *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1

L.Ed.2d 639 (1957), they conclude that "Tucker did not receive a fair trial". *Id.* It is with both the majority's premise, unsupported by the record, and its conclusion, a *non sequitur*, that I disagree.

The record discloses that Tucker knew the informant Gene fairly well. Tucker testified that on the day of the heroin sale he had entered an apartment, the door to which Gene had opened; that they had joked about a birthday party that had not "come off" one and a half years earlier; that in Tucker's presence Gene and Yearby tested narcotics; and that Tucker and Gene together with Yearby and Special Agent Adams spent a considerable portion of the afternoon together in the apartment of the mother of Tucker's child. The inference to be drawn from such personal contact is that Tucker was familiar with Gene. Moreover, in answer to a pretrial question from the court, Tucker conceded that he knew the informant's true first name and the address he had given. And according to this counsel, Tucker knew quite well what Gene looked like. Nonetheless, Tucker claimed that he could not find him. Apparently Tucker's counsel was as "unable" to locate Yearby as well. But the record makes abundantly clear that Gene's identity was as available to Tucker as to the Government. This, to borrow the majority's phrase, makes "nonsense" of the claim that the nondisclosure denied Tucker a fair trial. *See United States v. Casiano*, 440 F.2d 1203 (2d Cir.), *cert. denied*, 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (1971); *Smith v. United States*, 273 F.2d 462 (10th Cir. 1959) (*en banc*), *cert. denied*, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729 (1960). In light of the above conceded facts, I cannot subscribe to the underlying factual assumption that the informant Gene, "the witness whose identity and whereabouts were never disclosed to the defense," *supra*, at 206 (but who, the record reveals, was obviously well known to Tucker), was a witness whose nonappearance could ever raise an issue under *Roviaro*.

Furthermore, *Roviaro* does not require reversal here. In *Roviaro*, the undisclosed informant was the *only* direct participant in the events leading up to and consummating the drug transaction, and was the *only* person who could have testified with full knowledge of his conversations with the defendant; he was the sole instigator of the transaction and the only person who could shed light on Roviaro's motives. By contrast, at each stage of events in this case, there were at least three other people who witnessed Tucker's activities.

*Roviaro* leaves in the discretion of the trial judge the weighing of interests relevant to a decision to disclose, directing the judge to consider the crime charged, the possible defenses, the possible significance of the informant's testimony, and other relevant factors in the circumstances of the case. 353 U.S. at 62, 77 S.Ct. 623. Here, the defendant repeatedly failed to offer any explicit reason for his request for disclosure other than the unsupported assertion that it would help the defense. Nor were there any facts solely within the knowledge of the informant. The name of Seville Yearby, who was present at the apartment when Adams was introduced to Tucker, was given to the defense, yet the defendant made no real effort to find him. In all, the decision of the district court not to require disclosure of the informer's identity cannot be described as clearly erroneous.

Moreover, Tucker has failed to show that the district court did not draw an inference favorable to the defense from the Government's failure to call Yearby and the informant to testify. Indeed, the court could reasonably have convicted Tucker despite the inference, for two other DEA agents testified as to the movements of the parties; the only direct support for Tucker's story came from his paramour; and demeanor could have played a crucial part in the trial. Besides, it would be difficult for Tucker under any circumstances to overcome the skepticism which naturally arises in light of his testimony as to being invited into a room by virtual strangers to witness a drug transaction, and then inviting those men over to his paramour's apartment only to ignore them.

On the facts and testimony shown in this case, and on the applicable law, Tucker's conviction was justified and should be affirmed.