**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Carl E. BANKS and Arthester McCruiston, Defendants-Appellants.**

**Nos. 81–1420, 81–1167.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1981.

Decided Aug. 23, 1982.

---

**16.** *See infra* text accompanying note 9.

David C. Thomas, Chicago Kent College of Law, Chicago, Ill., Rebecca Balanoff, Hammond, Ind., for defendants-appellants.

Paul A. Murphy, Asst. U. S. Atty., South Bend, Ind., for plaintiff-appellee.

Before SWYGERT, Senior Circuit Judge, and PELL and BAUER, Circuit Judges.

PELL, Circuit Judge.

On December 3, 1980, a jury convicted the appellant Arthester McCruiston of knowingly and intentionally distributing heroin in violation of 21 U.S.C. § 841(a)(1) (1976) and 18 U.S.C. § 2 (1976). In the same trial, the appellant Carl E. Banks was convicted of the same offense as an aider and abettor in the offense charged. McCruiston was sentenced to five years imprisonment and three years of special parole. Banks was sentenced to five years imprisonment. Banks appeals from his conviction asserting that his level of involvement in the offense charged was not sufficient to sustain his conviction as an aider and abettor. McCruiston appeals on the grounds that the district court erred in its refusal to sever the trials, in its supervision of the voir dire, and in its ruling on admission of McCruiston's prior convictions.

I. Factual Background

On September 17, 1980, Chicago police officer Herbert Milton, acting undercover with the Federal Drug Enforcement Administration (DEA), met with Carl Banks at the A&M Lounge in Waukegan, Illinois. There they discussed the sale to Milton of three ounces of heroin from a source of supply in Gary, Indiana. Milton asked if he could go with Banks' "courier" on the trip to Gary. Banks told Milton the trip could not be made until after September 19, 1980, because his courier would be in the hospital until that date. Banks was unable to quote Milton a price on the heroin.

On September 26, 1980, Milton again met with Banks at the lounge. Banks asked Milton if he still intended to purchase the three ounces of heroin. When Milton replied that he did, Banks told him, "Rather than make the trip to Gary, you could buy some brown heroin from me here." When Milton hesitated, Banks told him to go ahead and make the trip. Banks then brought over Arthester McCruiston, who began to negotiate with Milton about the heroin.

Milton said that he had $8,000.00 to spend but McCruiston said that he could not provide a price per ounce because his supplier in Gary was on his way back from New York with half a kilo. At this point, in McCruiston's presence, Banks reassured Milton as to McCruiston's reliability and both appellants began to boast of their drug transactions. Eventually Milton left with the understanding that he would call at a later point in the day to arrange going to Gary.

Later Milton called the A&M Lounge three times. On the first call Milton asked Banks if McCruiston was there, and McCruiston came to the phone and told Milton that his supplier was not yet back from New York. At about 4:40 p. m., Milton called and was told by Banks to come to the lounge and that everything was ready.

Milton and DEA Agent Patricia Collins went to the A&M Lounge at 4:55 p. m., and Milton went into the lounge with Banks and met McCruiston. McCruiston told Milton

that everything was set and that the price was $2,600.00 per ounce. At one point in this discussion Banks told Milton, "Don't worry. I know you don't want to put your money out in front, but you have to give Thes the money, he will go make the buy and then he will meet you."

Milton, Collins, and McCruiston then left for Gary following McCruiston's directions. On the way, McCruiston discussed how he would take the money into his source to obtain the heroin. En route, McCruiston stopped to call his contact in Gary and then assured Milton and Collins that everything was ready. At 7:30 p. m. they arrived in Gary and proceeded to a house that McCruiston said was his source's house. McCruiston went into the house, and then returned to the car and suggested that they drive around a while until the package of heroin was ready. After over two hours of driving with McCruiston making occasional calls, they returned to the house and McCruiston again went into the house. At approximately 10:45 p. m. McCruiston came out of the house and informed the agents that he would bring them a sample of the heroin.

At approximately 11:05 p. m., McCruiston brought to the officers in the car a sample of what he said was ". . . the exact same heroin you are going to buy." Milton pretended to sample the heroin and told the appellant that the heroin was good. McCruiston then asked for the money and Milton refused. McCruiston went back into the house and returned in approximately ten minutes with two plastic bags of white powder. Agent Collins then proceeded to arrest McCruiston. Subsequent chemical analysis revealed that the two plastic bags of white powder brought by McCruiston to the car contained heroin.

II. Admission of McCruiston's Prior Convictions

McCruiston's primary objection to the district court decision is predicated on the admissibility of McCruiston's prior convictions for impeachment purposes. It is the position of McCruiston that the court ruled these convictions to be admissible for impeachment purposes without complying with this court's decision in *United States v. Mahone*, 537 F.2d 922 (7th Cir.), cert. denied, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976).

In *Mahone*, we urged trial judges to balance the probative value of prior convictions against their prejudicial effect, as required by Federal Rule of Evidence 609(a) after a hearing on the record, and to find explicitly that the prejudicial effect was outweighed by the probative value if the convictions are to be deemed admissible. Such an explicit finding is desirable to aid the appellate court in assessing whether the requirements of Rule 609 had been met. In *Mahone*, we also set forth some of the factors to be considered in the balancing determination: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. *United States v. Mahone*, 537 F.2d 922, 929 (7th Cir. 1976).

After the district court's decision in this case, this court reaffirmed the principles enunciated in *Mahone* and evaluated when a trial court should make its balancing determination on the record in response to a pretrial motion to exclude prior convictions. Federal Rule of Criminal Procedure 12(e) states that "[a] motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial. . . ." In *United States v. Fountain*, 642 F.2d 1083 (7th Cir.), cert. denied, 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981), we noted that the pre-trial motion in that case filed three weeks before the trial could have been decided before trial, but on the facts of the case we found no reversible error because the defendant at the pre-trial conference had agreed to defer the hearing on the motion until later.

In the present case, the defendant filed a motion *in limine* on December 1, 1980, just minutes prior to the trial, while the jury

panel waited. The court had previously ordered on October 16, 1980, that all pre-trial motions were to be filed within ten days. The defendant claims that its delay in filing was attributable to the Government's delay in conveying to him a list of his prior convictions. In any event, the trial judge permitted filing of the motion and allowed the defendant to argue the motion.[1]

Counsel for McCruiston argued the motion incorporating the *Mahone* standards but not referring to the case by name. At the end of defendant's argument, the court responded, "[W]e are not faced with it right at the moment. The Rule provides for 10 years, as you know." When asked by counsel for McCruiston for a ruling in order to make an opening statement, the court said:

> My posture is that I will admit it, but I want to look into the matter further. There is a decision by Judge Swygert I want to go back and read.

It is this purported "ruling" from which McCruiston appeals and upon which his refusal to testify was purportedly based. The court did not at any time afterwards address the motion nor was the motion again urged by McCruiston.

In *United States v. Sternback*, 402 F.2d 353 (7th Cir. 1968), *cert. denied*, 393 U.S. 1082, 89 S.Ct. 862, 21 L.Ed.2d 774 (1969), this court was presented with a similar factual situation and equivocal "ruling." In that case, the defendant made a motion to exclude prior convictions during a recess in the government's case. The judge indicated a ruling but expressed concern about other relevant decisions and concluded, "We will check it out." Subsequently no precise ruling by the court or renewed motion by defense counsel was made. We concluded that "... if this defendant's fear of the use of the conviction was indeed the reason why he decided not to testify it was incumbent upon counsel to pursue the question and obtain a definite ruling." Thus, we refused to find that the issue had been preserved for appeal.

On the facts of this case before us, the district court judge initially concluded that the parameters of the case had not been sufficiently developed to warrant a pre-trial ruling on the motion. He indicated his inclination to admit the convictions but expressly reserved a ruling until he could at least check another decision. Under these circumstances, there was no definite ruling at that point admitting the convictions from which McCruiston could appeal. McCruiston failed to renew his motion at any time thereafter to obtain a ruling. Under *Sternback*, therefore, the defendant is in no position to contend in this appeal that he was prevented from testifying in his own behalf by an erroneous ruling.

The dissent attempts unsuccessfully to distinguish *Sternback* and thereby excuse defense counsel's failure to pursue the motion on the grounds that *Sternback* did not involve a pre-trial motion. Noting that the motion *in limine* in this case was a pre-trial motion, the dissent claims that it was reasonable for McCruiston's counsel to expect that the motion would be ruled on prior to trial and therefore reasonable for him to conclude that a ruling had been made. The dissent chooses to ignore that the motion was filed just minutes prior to trial while the jury panel waited and after the deadline set by the court for the filing of all pre-trial motions pursuant to Rule 12(c). Moreover, the motion does not fall into any of the categories of motions under Rule 12(b) that must be made prior to trial, for which a pre-trial ruling might be more reasonably expected. In light of these facts and the court's statement that it wanted to look into the matter further, the dissent's assertion that it was reasonable for defense counsel not only to expect a ruling prior to trial but also to believe a ruling had in fact been made strikes us as unrealistic.

Nothing in our decision in *Sternback* or its application to this case conflicts with

---

1. Ordinarily, if the motion had been deemed untimely by the district court under Federal Rule of Criminal Procedure 12(f), there would be no need to address this issue as the untimely filing would have constituted a waiver of the issue below. However, as the district court did agree to consider the motion and grant relief from any waiver, the issue is preserved for this appeal.

Rule 12(e) or this court's decision in *Mahone*. *Mahone* dealt only with the requirements of Federal Rule of Evidence 609(a) and on its facts did not address the time within which a court must rule on a pre-trial motion to exclude prior convictions under Rule 12(e). Nothing in *Mahone*, nor for that matter in *Fountain*, establishes a per se rule that all pre-trial motions to exclude prior convictions must be ruled on prior to trial. As Rule 12(e) states, the court shall rule on all pre-trial motions prior to trial unless the court defers determination "for good cause."

The occasional difficulty of ruling on such motions prior to trial is well illustrated by the present case. The defendant claimed in his motion that admission of the prior convictions would impair his defense of entrapment, but the only defense the defendant actually presented during the trial was a so-called "sting" defense that the defendants had intended to abscond with Milton's money without ever providing any heroin. Although the prior convictions might have been admissible for purposes of showing prior disposition to rebut an entrapment defense, their admissibility would have been another matter altogether in relation to a "sting" defense.

The motion in this case was filed only minutes before trial. The trial court deferred its ruling only until such time as the facts had been sufficiently developed for a determination or at least until it could check additional case law. Given these facts, the district court did not run afoul of Rule 12(e) in deferring its ruling until after the trial had commenced. We are not convinced by the defendant's argument that a pre-trial ruling was necessary under these circumstances for preparation of his opening statement. The limited purpose of opening statement is to delineate the evidence the defense intends to present. It is not unusual for defense counsel to dispense with opening argument altogether to await developments during trial, and it is certainly not necessary or perhaps even advisable to specify whether a defendant will take the stand at such an early stage.

Further, we have observed that generally defense counsel choose not to have the defendant take the stand in order to press the Government into proving its case without the opportunity to impugn the defendant's credibility, and that the attitude of the criminal bar is that it usually is a mistake for the defendant to take the stand. Our remarks in this respect, of course, in no way are intended to minimize the importance, from a constitutional point of view, of the law that no inference should be drawn from the failure of a defendant to testify in his own behalf.

In the present case, while defense counsel did at one point say he did not see how his client would be able to take the stand in the case if the convictions were to be admitted, the record is silent as to any clear statement that even in the absence of their admission, it was contemplated that the defendant would testify.

Therefore, we conclude that the trial judge acted within the parameters of Rule 12(e) in deferring his ruling until after the commencement of the trial. Thereafter it became incumbent upon defense counsel to renew his motion to obtain a definitive ruling from which to appeal. Having failed to do so, the defendant failed to preserve the issue for appeal.

### III. McCruiston's Motion for Severance of the Defendants' Trials

Before trial, McCruiston filed a motion to sever his trial from that of Banks pursuant to Rule 14 of the Federal Rules of Criminal Procedure. The grounds for the motion stated that the defendants' defenses were "antagonistic and inconsistent" and that there was a substantial probability that the defendants would make statements incriminating each other. In this appeal, McCruiston additionally claims that the actual conduct of Banks' defense unfairly prejudiced McCruiston in that: (1) counsel for Banks made remarks in her cross-examination of Milton and her closing argument which implicated McCruiston in the offense charged; (2) the testimony of Milton included statements of Banks which prejudiced McCrui-

ston and violated McCruiston's Sixth Amendment right to confrontation of witnesses; and (3) the court denied McCruiston's request for additional peremptory challenges.

 "Mutually antagonistic" defenses mandate severance only when acceptance of one party's defense precludes the acquittal of the other. *United States v. Ziperstein*, 601 F.2d 281, 285 (7th Cir. 1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). A review of the record reveals that the proffered defenses of Banks and McCruiston failed to meet this standard. Despite McCruiston's pre-trial references to a defense of entrapment, from opening to closing statements both defendants offered the defense that their plan had been to abscond with Milton's money without any actual transfer of heroin. Banks asserted an alternative defense that his level of involvement could not rise to the level of aiding and abetting even if the jury did find that the offense had been committed as charged. However, Banks did not refute, and in fact frequently reaffirmed, his alternate theory of defense that a "sting" had been intended and not a drug transaction. Even had McCruiston offered a defense of entrapment, Banks' defense would not have conflicted with McCruiston's. Therefore, the defenses of the defendants did not mandate severance.

 Even though the defenses did not mandate a severance, it is still necessary to determine whether the actual conduct of Banks' defense so prejudiced McCruiston's defense as to warrant severance. This grounds for severance, however, depends on a careful evaluation of facts elicited, prejudicial tendencies, and the entire course of the trial prior to the challenged conduct. *United States v. Ziperstein*, 601 F.2d 281, 286 (7th Cir. 1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). Accordingly, the denial of a motion for severance will not be disturbed in the absence of an abuse of discretion. *United States v. Tanner*, 471 F.2d 128 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972).

On this appeal, McCruiston objects to statements of Banks' counsel during her cross-examination of Milton and her closing argument. We need not address this issue because McCruiston failed to object to the statements during the cross-examination and failed to object during the closing argument until after the jury had retired, at which time he moved for a mistrial. Moreover, review of the record demonstrates that in context most references to the conduct of McCruiston were used to strengthen the "sting" defense and the prejudicial effect, if any, on McCruiston's defense was minimal.

McCruiston's next objection to the actual conduct of the trial is also without merit. The objection focuses on statements of Banks brought out in the testimony of Milton which purportedly implicated McCruiston. According to McCruiston, the admission of these extra-judicial statements of a co-defendant mandate reversal and remand for separate trials because they were highly prejudicial to McCruiston's defense and violated his Sixth Amendment right to confrontation of witnesses in that McCruiston did not have the opportunity to cross-examine Banks on any of the statements he allegedly made. All statements attributed to Banks and offered through the testimony of Milton took place during the transaction which formed part of the offenses charged against both defendants and were made in furtherance of the joint efforts of both defendants to commit the crime. The only statements by Banks to which McCruiston specifically objects is his statement to Milton that McCruiston would "make the buy" if Milton gave McCruiston the money.

Any prejudice from admission of Banks' statements was insignificant and clearly does not warrant reversal and remand for separate trials. Throughout Milton's testimony, the judge gave the jury an instruction, each time it was requested, that the statements made by Banks in McCruiston's absence were evidence only as to Banks. McCruiston failed to object or request a jury instruction following the only statement by Banks to which he specifically ob-

jects in this appeal. At the end of the trial, the judge gave the instructions requested by McCruiston that no statement made by one defendant in the absence of the other could be considered as evidence against the absent defendant, and that statements in the indictments could not be considered as evidence. Nor was there any Sixth Amendment violation. We note that the statements were made during the commission of the offense charged. *McGregor v. United States*, 422 F.2d 925, 926 (5th Cir. 1970) (per curiam). It was not disputed that the statements were actually made, and there was circumstantial evidence supporting the truth of the statements. *United States v. Blakey*, 607 F.2d 779, 786 (7th Cir. 1979). For these reasons, nothing in the nature of the defendants' defenses or the actual conduct of the trial compels us to find that the district court erred in denying severance. We will address the issue of peremptory challenges below.

IV. McCruiston's Motion for a Comprehensive Jury Selection Plan

On the day of the trial, McCruiston presented to the court a motion for a jury selection plan which included the following: (1) access to the "qualification questionnaire" on each potential juror; (2) additional peremptory challenges for the defendants as provided for in Federal Rule of Criminal Procedure 24(b); (3) the right of the attorneys to conduct the voir dire or to ask the follow-up questions to the court's voir dire; (4) the opportunity to voir dire each individual juror out of the presence of the other jurors; and (5) a request for the court to utilize the questions included in the motion if the court alone conducted the voir dire. The motion was predicated in part on assumptions of prejudice resulting from the nature of the offense, pre-trial publicity, and the race of the defendants. The court denied the motion and conducted voir dire on its own.

The manner in which a trial court conducts the voir dire examination will not constitute grounds for reversal unless there has been a clear abuse of the court's discretion. *United States v. Harris*, 542 F.2d 1283, 1295 (7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). The trial court, when asked to submit follow-up questions to the panel as a whole, ordinarily did so.[2] Refusal to interrogate the jurors individually may be within the court's discretion, even when the issue of pre-trial publicity is raised. *United States v. Kampiles*, 609 F.2d 1233, 1240 (7th Cir. 1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The trial judge, in his discretion, may assume responsibility for questioning the jurors. *United States v. Hoffa*, 367 F.2d 698, 710 (7th Cir. 1966); *vacated on other grounds*, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967). The trial court is also allowed considerable discretion in determining whether to submit additional questions, *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1973), and refusal to submit questions is not reversible error when in substance the defense received the information specifically requested and review of the voir dire reveals that the court made "sufficient inquiry as to the background and attitudes of the jurors to enable the litigants, not only to challenge for cause, but to exercise their peremptory challenges." *United States v. Esquer*, 459 F.2d 431, 434 (7th Cir. 1972), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973) (quoting *Spells v. United States*, 263 F.2d 609, 611 (5th Cir.), *cert. denied*, 360 U.S. 920, 79 S.Ct. 1439, 3 L.Ed.2d 1535 (1959)).

We are not unmindful that the literature on effective trial practice currently is placing emphasis on the scientific selection of juries. Methods of predicting with any great degree of accuracy how twelve human beings, often with diverse backgrounds and from different walks of life, will react to a specific set of facts might seem to have aspects of significant uncertainty, barring such predictions having been made following an individualized session with each jur-

---

2. The judge refused to give only six of the approximately fourteen additional questions requested by both defense counsel during voir dire.

or by a skilled psychologist. In any event, if the voir dire is to take the place which the dissent would seem to want it to have in the process, we would be returning to a trial within a trial, with the attorneys asking, or having the judge ask, unlimited questions, and with the underlying purpose often that of indoctrinating the prospective jurors with the questioner's theory of the case, without the necessity of putting on sworn witnesses.

This former procedure has been abandoned by the district courts in this circuit, and properly so. The dissent has chosen as an example of the claimed incompleteness of the voir dire the refusal to ask a woman with teenage daughters whether she had drug-related problems in her family. The judge had asked all of the prospective jurors concerning possible drug problems in their families. If he then had singled out a woman who had not indicated any problems in her family generally by emphasizing her particular family situation, it seems to us it would have been suggestive that perhaps she had not truthfully responded to the general questions. Jurors should not be excused from answering questions that might reflect upon their ability to serve, but we think the judge properly refrained from asking the suggested follow-up, highly embarrassing, question when no basis had been shown for doing so.

■ Our review of the voir dire convinces us that the judge did ask the key questions not only to ascertain to his satisfaction that the jurors would fairly try the case, but also to enable the defendant intelligently to exercise his challenges. In sum, in the absence in this record of any indication from the responses to the questions asked of a need for further follow-up questions, we find no abuse of discretion in the manner in which the voir dire was conducted.

As to the issues of pre-trial publicity and racial prejudice specifically, we note that the judge inquired of the panel as a whole their attitudes toward the race of the defendants. When asked subsequently by defense counsel for a question as to racial prejudice, the court responded that it had

already asked such a question and asked again if any of the jurors would be prejudiced against the defendants due to their race.

The dissent erroneously states that the judge posed only one question to the jurors on racial bias. When asked to pose a follow-up question on racial bias, the judge directed the following questions to the jurors:

Ladies and gentlemen, as is apparent, the defendants in this case are both black. I would ask that you raise your hand if this question applies to you: Would the fact that the defendants are both black in any way prejudice any of you against either one of these defendants, or would you be willing to try this case strictly on the basis of the evidence introduced in the courtroom, or any exhibits that are introduced?

Let me ask you, would all of you be willing to set aside any prejudice you might have and decide this case strictly on the basis of the evidence? I take it from the way you are nodding your heads that you would. You are saying to me that none of you have any prejudice because of race, is that correct? If it isn't raise you (sic) hand, please. Very well.

The court also asked whether any of the jurors had heard of the case, read about it in the newspapers, or heard of it on the radio. No further questions on pre-trial publicity were submitted by defense counsel.

Pre-trial publicity was not as extensive or racially inflammatory as was the case in *United States v. Bear Runner*, 502 F.2d 908 (8th Cir. 1974), upon which the defendant primarily relies. In *Bear Runner*, an American Indian convicted of larceny challenged on appeal the sufficiency of the trial court's voir dire on two issues—pre-trial publicity and racial prejudice. In the months preceding the trial, several disruptive incidents involving American Indians, including the well publicized occupation of Wounded Knee, had occurred in the district in which the defendant was tried. These incidents had received not only extensive local but

national publicity. The Eighth Circuit noted that the trial court had asked a single question on both the issue of pre-trial publicity and racial prejudice to the prospective veniremen as a group. *Id.* at 910 & 912. The court found that any objection to the adequacy of the voir dire on the issue of pre-trial publicity had not been adequately preserved for appeal because the defendant had not submitted any further questions on the issue or sought leave to interrogate the jurors on the matter of pre-trial publicity. In finding the voir dire inadequate only on the issue of racial bias, the Eighth Circuit emphasized that the defendant's trial had taken place in October of 1973, the events of Wounded Knee had taken place that spring in the same general locality, and the intense feelings of the local citizenry about the incidents had necessitated that the criminal charges against those American Indians involved in the Wounded Knee incident be moved out of the locale. *Id.* at 912. These unusual circumstances created an atmosphere of racial bias that necessitated further inquiry into the issue in the voir dire beyond the single question asked by the court.

The pre-trial publicity and resultant racial bias, if any, in the case before us certainly cannot be said in any sense to approach the intensity of that involved in *Bear Runner*. Here, the pre-trial publicity was of a routine nature with no indication it was other than the type of media coverage customary for nearly any local criminal proceedings, particularly in the area of prosecution of drug-related crimes. The focus of the events and publicity found in *Bear Runner* to engender racial bias was the racial conflict between the American Indians and local citizenry. To suggest, as the dissent appears to do, that any publicized narcotics crime involving blacks creates an atmosphere of racial bias akin to that in *Bear Runner* is an unwarranted expansion of that decision. Moreover, the trial court in this case did ask a follow-up question on the issue of race when requested to do so by defense counsel. The dissent acknowledges that the Eighth Circuit's decision on the issue of race had been tendered by the trial court in *Bear Runner.*

Further, we note that in the extensive quote in the dissent from *Bear Runner*, the court focused on the "sensitive case." *Bear Runner* was such a case on the issue of racial prejudice. The case before us was not and we discern nothing in the "overall circumstances and surroundings" suggesting "the possibility of racial bias," unless we assume that this exists in every case in which a black person is a party. We are unwilling to make such an assumption. Although the questions were formulated to necessitate an affirmative response from jurors who thought themselves to be prejudiced, that in itself does not render the voir dire inadequate. *See, e.g., United States v. Dixon*, 596 F.2d 178, 182 (7th Cir. 1979). On these facts, we conclude the issues of racial prejudice and pre-trial publicity were sufficiently explored so that reversal is inappropriate.

McCruiston also contends that the denial of additional peremptory challenges to the defendants was error due to the antagonism of the defendants' positions. Specifically McCruiston claims that he wanted to remove a juror after he had exercised his five peremptory challenges, but that Banks' counsel refused to remove the juror. Federal Rule of Criminal Procedure 24(b) provides that, with multiple defendants, the government is entitled to six peremptory challenges and the defendants jointly to ten. The court is given discretion to grant the defendants additional peremptory challenges and to permit them to be exercised either separately or jointly.

We have previously concluded that the defenses of Banks and McCruiston were not in fact antagonistic. Close examination of the record also reveals that McCruiston was not precluded from exercising the final peremptory challenge as to the juror in question. The court initially told the defendants they had ten challenges cumulatively. When told they might not be able to agree on exercise of the challenges, the court said that each defendant would have five. At the time the juror in issue was

being questioned, the following exchange took place:

Mr. Thomas: Your Honor, I would like to state for the record, of course I don't have any more peremptories, I do not like Mr. Anderson but Mrs. Balanoff likes him.

The Court: You have ten collectively, you can take him off.

Mr. Thomas: But I would be acting against the interest of co-counsel—involuntary co-counsel, but co-counsel nevertheless.

The Court: That is between you and counsel.

Mr. Thomas: For that reason I am not exercising a peremptory.

Mrs. Balanoff: I am not exercising it.

The Court: As long as we understand that you have one more, if you care to exercise it.

Thus, it appears that counsel for McCruiston did have a remaining peremptory challenge which could have been exercised had McCruiston chosen to do so. Under these circumstances, there was no error in the award of peremptory challenges or resultant prejudice to the defendant. *See, e.g., Mastrian v. McManus,* 554 F.2d 813, 818 (8th Cir. 1977), *cert. denied sub nom. Mastrian v. Wood,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977); *Van Duyse v. Israel,* 486 F.Supp. 1382, 1388 (E.D.Wis.1980).

## V. Banks' Conviction for Aiding and Abetting

The only argument raised by appellant Banks in this appeal is that his involvement in the offense did not rise to the standard of involvement required for an aider and abettor. This argument is without merit. In *United States v. Tucker,* 552 F.2d 202 (7th Cir. 1977), this court was also presented with the argument that the defendant was not sufficiently involved in the drug transaction. In that case, the defendant pointed out that there was no evidence that he was at the scene of the transaction or that he received any of the proceeds of the sale. In response, this court noted that the Government's theory of criminality was that the defendant had knowingly set up the sale by introducing someone whom he knew to be a willing buyer to someone whom he knew to be a willing source for the purpose of facilitating a transaction; and that this theory, if proven, would sustain a conviction for aiding and abetting. *United States v. Tucker,* 552 F.2d 202, 204 (7th Cir. 1977).

There is no question that the evidence in this case was sufficient to demonstrate that Banks introduced Milton, a desirous buyer, to McCruiston, a willing source, to facilitate a drug transaction between the two of them. Milton had met with Banks on September 17 and had discussed buying three ounces of heroin from Banks. Banks told Milton that his "courier" would go down to Gary and pick up the heroin. Banks did not set a price because he was unable to do so. When Milton said he would like to go along on the ride to Gary, Banks agreed to arrange a meeting between Milton and the courier. On September 26, Milton met with Banks at the A&M Lounge and they discussed the quantity and type of heroin Milton wanted. Banks asked Milton if he intended to purchase his three ounces that day and Milton said that he did. Banks then asked if Milton wanted to buy some brown heroin to save himself a trip to Gary for white heroin. When Milton hesitated, Banks told him to go ahead and make the trip. Banks told Milton that he would get the courier and have him call Gary to see if the heroin was available. Banks then left the room and returned a few minutes later with McCruiston. At one point when he perceived that Milton was concerned about the deal, he reassured Milton that McCruiston would deliver the drugs if Milton gave McCruiston the money. After the negotiations had ended, it was Banks who told Milton, when he called the A&M Lounge later in the day, that he should come to the lounge.

There can be no question on this evidence that Banks did everything possible to facilitate a drug transaction between Milton and McCruiston. We cannot accept Banks' position that he actually had to travel to another location than the A&M Lounge, his occa-

sional place of employment, for the introduction, or that he had to make contact with the source after the sale for there to be sufficient evidence under *Tucker* to sustain the conviction. Banks discussed the quantity and quality of the heroin to be purchased, arranged Milton's meeting with his source, and at one point reassured Milton of McCruiston's capabilities to ensure that the deal would not deteriorate. As in *Tucker*, the denial of the defendants' motion for a judgment of acquittal was not reversible error.

## VI. Part III of the Dissent

Bearing in mind the validity of an admonition sometimes directed to appellate judges that we sit to decide cases, not to write essays on society, we perhaps should ignore Part III of the dissent particularly because the failure to observe this salutary guideline is often, itself, the cause of public criticism of the courts. Nevertheless, because of possible implications of Part III bearing on the majority opinion we feel it necessary to address Judge Swygert's lucubrations.

We, of course, cannot disagree with the necessity for a procedurally fair trial although that and not a perfect trial is what the Constitution guarantees. The Constitution speaks in terms of due process and as Justice Frankfurter observed, "Fairness of procedure is 'due process in the primary sense.'" *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (quoting *Brinkerhoff-Faris Co. v. Hill*, 281 U.S. 673, 681, 50 S.Ct. 451, 454, 74 L.Ed. 1107 (1930)).

A very real rationale for the fairness requirement in a trial is to assure that an innocent person is not convicted. That arguably could be said to have no bearing in the present case as even the dissent concedes that McCruiston was probably guilty of the crime of which he was charged. We add that we are not relying on harmless error, an apparent anathema in the eyes of the dissent, even though it is clear from the record of this case that the evidence of McCruiston's guilt as charged was overwhelming.

The matter does not end at the trial level because from the appellate point of view we cannot in the process of affirming lay down principles or guidelines of trial procedure which might later be the basis of convicting an innocent person. We do not think we have done so here.

Looking at what might be construed to be an implication of Part III of the dissent, we choose to assume that our respected brother Swygert is not suggesting that the panel in this case has succumbed to public pressure even though we must agree with the observation that there is a feeling on the part of many people that the judiciary is too soft on criminals. We do not regard this as one of those felt needs of the times to which the judiciary should respond.

Nor, indeed, will we assume that Judge Swygert is implying in the numerous various dissents he has filed in this court to opinions affirming a conviction or denying habeas corpus relief [3] that other panels have buckled under to public indignation.

We find it interesting that the first example cited by the dissent for the debasing and debilitating effect of deciding cases "according to public opinion" is that the "criminal defense bar is apt to become disillusioned and cynical." We are not at all certain that on balance between a public which has become disillusioned and cynical because a guilty criminal has been freed on an unnecessarily overly technical ground and a criminal bar which has a similar attitude because its objective of freeing a

---

**3.** Thus, from January of 1981 to May of 1982 there were the following dissents: *United States v. Horton*, 676 F.2d 1165 (7th Cir. 1982) (conviction); *United States ex rel. Gorham v. Franzen*, 675 F.2d 932 (7th Cir. 1982) (habeas); *United States v. Black*, 675 F.2d 129 (7th Cir. 1982) (conviction); *United States v. Galloway*, 664 F.2d 161 (7th Cir. 1981) (conviction); *United States ex rel. Haywood v. Wolff*, 658 F.2d 455 (7th Cir. 1981) (habeas); *United States v. Plisek*, 657 F.2d 920 (7th Cir. 1981) (conviction); *Jacks v. Duckworth*, 651 F.2d 480 (7th Cir. 1981) (habeas).

guilty person has not been successful, the public interest might not be the more deserving of protection. Certainly every criminally charged person has the right to a fair trial but so does the Government in its prosecutorial efforts on behalf of coping with what appears to be an increasing growth of criminal violations.

Finally, with regard to the bitterness that the dissent feels may be produced in the minds of the incarcerated defendant, we are inclined to doubt that very many are reconciled to a prison term even if the unusual perfect trial had been the cause of their confinement. As to rehabilitation, we are aware of a growing feeling that rehabilitation just has not proved realistically to be possible. We decline to speculate whether this lack of success is attributable to a feeling on the part of the prisoners that their trials were procedurally unfair in some respect, particularly if that respect was one which had not occurred to a prisoner until it was suggested by an ingenious counsel.

We have considered other questions asserted by the defendants during the course of this appeal and find no reversible error therein; nor do we see any basis for concluding other than that the defendants had a fair trial. For these reasons, the convictions of the defendants are

AFFIRMED.

SWYGERT, Senior Circuit Judge, concurring [1] and dissenting.

With respect to Arthester McCruiston, I respectfully dissent. This conviction should be reversed because the defendant did not receive a fair trial. Though probably guilty of the crime of which he was charged, Arthester McCruiston nonetheless was entitled to the constitutional protections that are guaranteed to every person charged with criminal activity. Those protections are extended to the guilty as well as the innocent.

The conviction is flawed in two areas: the selection of the jury and the ruling on a defense motion to exclude certain evidence.

I

Defendant McCruiston filed a motion for a "Comprehensive Jury Selection Plan." The motion stated that the case had received extensive local media publicity, that the local community viewed drug traffic with great disapprobation, and that the defendants were black. The motion was supported by factual material and expert opinion. With respect to the extensive publicity, it was alleged that:

1. The Gary Post Tribune published an article on the front page with a picture of Haywood Turnipseed and the headline "Narcotics" on continuation, and

2. The Hammond Times published an article with the headline "3 Held on Drug Charges."

On September 30, 1980:

1. The Gary Post Tribune published an article entitled "High Bond Set ...." and

2. The Chicago Sun-Times published an article about the arrest with the headline "Large Northwest Indiana Drug Ring Broken."

On October 8, 1980, the *Gary Post Tribune* published a follow-up article on the arrest.

McCruiston's motion sought allowance to supplement the trial judge's voir dire by questions posed either by defense counsel or by the judge on suggestion. The judge's cryptic ruling was, "The motion will be denied."

The voir dire examination of the trial judge was woefully inadequate. For example, despite the extensive pretrial publicity surrounding the case, the judge, after reading the indictment, posed only a single question of the venire as a whole:

Have you heard about it in the newspapers, or talked to anyone about it, heard about it on the radio or any other way?

Further, despite the fact that a great majority of the venire were white, the judge's

---

1. Carl E. Banks did not appeal from the trial judge's handling of the voir dire and I concur in the affirmance of his conviction.

inquiry was limited to a single question about racial prejudice again directed to the venire as a whole: [2]

> [T]his is a court of law, and prejudices or feelings as a result of race or religion, anything of that nature, have no place in a court of law. Do you all agree with that proposition that the guilt or innocence of any defendant should rest solely upon whether or not he is guilty under the law and the facts as produced, and on nothing else?

The trial judge also asked only a single general question to the entire venire concerning possible drug problems in the prospective jurors' families and prior experiences as witnesses in a criminal case.

The judge refused almost all of the follow-up questions requested by the defendant such as the occupation of children not living at home, whether jurors had ever been a victim of a crime, the jurors' views on credibility of law enforcement officers and whether a woman with teenage daughters had any drug-related problems in her family.[3]

The trial judge asked only three questions directed to the prospective jurors individually: marital status (and whether there were any children of a marriage), address, and occupation. When the judge questioned the venire as a group, the record does not reflect any response either individually or as a group. The trial judge overruled the defense's objection to this method of question and answer.

A trial judge may at some point abuse his discretion in not asking individually of the jurors on certain subjects. In the instant case, the need for individual questioning was paramount. Three sensitive issues confronted the jury: pretrial publicity, narcotics, and racial prejudice.

As Judge Pell said in *United States v. Lewin*, 467 F.2d 1132, 1137 (7th Cir. 1972):

> Prejudice and bias are deep running streams more often than not concealed by the calm surface stemming from an awareness of societal distaste for their existence. Extended and trial-delaying interrogation may not pierce the veil, yet a few specific associational questions as a maieutic process may indicate the dormant seeds of prejudice, preconceived and unalterable concepts or other non-fairness disqualifications. The result may not reach the stage of being a basis for cause challenge but could well, because of an abundance of counsel caution, bring about a peremptory challenge which an omniscient eye would have known should have been exercised.

> \* \* \* \* \* \*

At some happy mesne point, there must be permitted sufficient questioning to produce, in the light of the factual situa-

---

2. The judge asked one follow-up question concerning racial prejudice, indistinguishable substantively from the first, and again, the question was directed to the venire as a whole.

3. The trial judge denied the motion to ask the woman with teenage daughters if she had drug-related problems in her family because he felt the question was "too personal." I am disturbed by the judge's conclusion that a juror's interest in privacy surpasses an accused's right to an impartial jury. The question was relevant and was not one which would embarrass a juror without cause.

The majority's characterization of the question as "highly embarrassing" (maj. op. at 975) is inappropriate. The question would only be embarrassing if, in fact, there were drug problems in the woman's family. The general question concerning drug problems posed to the venire as a whole would have made it easy for a juror to conceal an embarrassing problem. I am disturbed by the majority's balancing of a juror's sensitivity (the majority think it was inappropriate to ask the question because it "might have been suggestive that she had not responded truthfully." Maj. op. at 975) against the defendant's right to an impartial jury.

Further, I am puzzled by the majority's conclusion that the trial judge "ordinarily" allowed follow-up questions. (Maj. op. at 974.) The judge allowed only four of McCruiston's follow-up questions (on pp. 40, 51, 60, and 65 of the transcript) and none were as important or revealing as the questions he refused to ask.

Footnote 2 in the majority's opinion refers to follow-up questions asked by both McCruiston's and Banks's attorneys. We are only concerned here with the questions asked by McCruiston's attorney. The questions asked by Banks's attorney did not address the issues that concerned McCruiston's attorney.

tion involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge.

The questions asked by the trial judge in this case called for affirmative responses. McCruiston was required to base his peremptory challenges on the way jurors nodded their heads or raised their hands, if they responded at all. Assuming a juror chose to conceal his prejudice, McCruiston would have nothing on which to base a challenge. Individual questioning with verbal responses would have alleviated these problems. It would have allowed McCruiston's attorney to concentrate on each individual juror, to observe a juror's demeanor and listen to the intonation of his or her response. These are the clues to the "dormant seeds of prejudice." I concede that group questioning and questions that require affirmative responses may be acceptable in some situations, but not in this case.

The majority relies on *United States v. Dixon*, 596 F.2d 178 (7th Cir. 1979), to support its conclusion that a question necessitating an affirmative response from jurors who think themselves prejudiced is sufficient. In *Dixon*, however, the judge asked six probing questions. Not only did Dixon's attorney have a greater opportunity to observe the jurors and their responses, but the nature and the number of the questions went a long way toward dissolving any latent prejudice. Here, the nature and the number of questions precluded such a favorable result.

The general questions and affirmative responses might have been adequate in this case if the judge had simply allowed suffi-

cient follow-up questioning. Proper formulation of the questions put to jurors requires special information regarding the issues, the parties, and the facts of the case. Often this knowledge is possessed by the accused's attorney, not the judge. For McCruiston, the dangers of prejudice were heightened by the nature of the crime charged and pretrial publicity. It was error to deny individual questions *and* followup questions. Either would have rendered the voir dire fair.

The Eighth Circuit voiced similar views in *United States v. Bear Runner*, 502 F.2d 908 (8th Cir. 1974). There the defendant was an American Indian charged with larceny in connection with the killing of a calf on an Indian reservation. The defendant contended that the trial court failed to question the prospective jurors adequately on the possible effects of pretrial publicity concerning Indians in general. The court asked a single question on the subject of the entire venire.[4] The Eighth Circuit reversed, holding that there was not sufficient inquiry about any prejudice against Indians on the part of the prospective jurors. The court was concerned that the publicity of recent events (Wounded Knee) would heighten the possibility of racial prejudice. We are faced with an analogous situation in this appeal. The possibility of racial prejudice is heightened by the narcotics element of the crime. The combination of these two concerns should have prompted the trial judge to ask individual questions or allow more searching follow-up questions.[5]

---

**4.** The question read:

American Indians are on trial here, that is, they are Indians and they are Americans. I wouldn't care whether they are American Norwegians or Swedes. They are to be treated like men.

Now this can be cut both ways. Is there anyone here with a prejudice either way concerning American Indians to such an extent that these gentlemen could not get a fair and impartial trial before you; that is, does any one of you have a prejudice either way? The United States has a right to have a fair trial as well as the Defendants. So, whatever way it goes, if you feel you are going to be preju-

diced either way I want to know about it right now.

Is there anyone that has such a prejudice or such a feeling?
502 F.2d at 910.

**5.** The majority believes this case is factually distinguishable from *Bear Runner* because the trial judge in this case asked one follow-up question. As we pointed out in footnote 2, *supra*, this follow-up question was indistinguishable in substance or form from the original question asked by the judge. Repetition of an inadequate procedure does not cure an error.

The following quote expresses the view that this court should have adopted in the instant case:

As the first Mr. Justice Harlan said, speaking for a unanimous Court, the right to challenge is "one of the most important of the rights secured to the accused" and that "[a]ny system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right must be condemned." In the instant case, the court's single question concerning racial bias was not only general in scope but was made to the prospective veniremen as a group. The effect was more like a monologue by the court than a probing examination of the jurors. Although the use of general questions has been approved by this court, the better practice in a sensitive case is to direct probing questions touching areas of possible prejudice to each individual juror, with the questions to be asked by the trial judge or counsel. Individual questioning is particularly necessary when the overall circumstances and surroundings suggest the possibility of racial bias. . . . The use of general questions such as that employed by the court here was recently looked upon with disapproval by the Supreme Court of Arkansas in *Cochran v. State*, 256 Ark. 99, 505 S.W.2d 520 (1974), where that court observed:

". . . All trial lawyers, and all students of the science of jurisprudence, know that *general* questions directed to the jury panel, or to individual jurors, by a judge who at the beginning of the trial has no special information regarding the issues, or the relationship of the parties, or the attending circumstances, sometimes fail to elicit answers which may cause even the most conscientious juror to reveal an existing prejudicial status."

*Id.* 505 S.W.2d at 521.

With this view, we agree.

The Sixth Amendment guarantees a criminal defendant an "impartial jury." Voir dire examination is the most effective way to fulfill that guaranty. The trial judge must not indulge in a *pro forma* performance. He must provide an adequate opportunity to expose any prejudice or bias whether acknowledged expressly or entertained latently. As Justice White said in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1964):

The voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protected.

Directly contrary to this admonition, the trial judge here asked general, rhetorical questions that were totally insufficient.

## II

The record fully supports defendant McCruiston's contention that the trial judge did not comply with the requirements of *United States v. Mahone*, 537 F.2d 922 (7th Cir. 1976). The entire proceeding concerning the defendant's motion in limine to preclude the Government from introducing his four prior convictions relating to drugs follows:

MR. THOMAS [defense counsel]: The last matter I have is the Motion in Limine, which I ask leave to tender to the Court. This is a motion to exclude prior convictions of the defendant McCruiston. I learned, I believe it was the 25th or 26th of November that the government intended to introduce a 1973 conviction for possession of dangerous drugs, which the defendant entered a plea. It is our contention the government should be precluded from introducing that because it is an old conviction, it is seven years old. It is for a crime that is certainly similar to the one with which the defendant is now charged and I believe the prejudicial effect of admitting that would far outweigh any probative value, and would invite the jury to convict him as an habitual criminal, which would be improper. It does not have any direct bearing on credibility, particularly since the defendant did not testify in the earlier proceeding.

Also, if your Honor sees fit to allow that into evidence, I just don't see how the defendant will be able to take the stand in this case, and this would certainly impair his ability to present a defense, particularly a defense of entrapment.

THE COURT: I will withhold that ruling on that. In any event we are not faced with it right at the moment. The Rule provides for ten years, as you know.

MR. THOMAS: Correct.

THE COURT: I understand your argument, and what you are saying to the Court, but there is no reason for me to rule at this time.

MR. THOMAS: Except, in order to present an opening statement, Judge, it would be helpful to know what the Court's posture is.

THE COURT: My posture is that I will admit it, but I want to look into the matter further. There is a decision by Judge Swygert I want to go back and read.

It should be noted that the judge did not ask Government counsel to respond to the motion even though it is the Government's burden to show the basis for the admission of a prior conviction when the issue is raised. *Id.*, 537 F.2d at 929. Nor is there any indication in the record that the judge took into consideration the factors deemed essential by *Mahone*. No reason was given for his denial of the motion except the statement that, "The Rule provides for ten years...." This is a clear violation of *Mahone*. The majority escapes this conclusion by deciding that the trial judge did not rule on the motion *in limine* and McCruiston waived the issue by not raising it later in the trial. I disagree.

Initially, the judge stated, "There is no reason for me to rule at this time." Nevertheless, McCruiston's attorney articulated an adequate reason for an immediate ruling: his defense strategy depended on whether he could put his client on the stand and he did not wish to do so if he would be faced with the impeaching convictions.[6] The trial judge then made a ruling subject to subsequent change. It was reasonable for counsel to conclude that the motion was denied unless further research changed the judge's mind. No such change was ever indicated. Under the circumstances, it was incumbent on the judge to make any further move, not on the defendant.

The majority's reliance on *United States v. Sternback*, 402 F.2d 353 (7th Cir. 1968), is misconceived. The significant difference between *Sternback* and this appeal is apparent from what we said in *Sternback*:

At a recess during the government's case, defense counsel informed the court of the conviction and asked for an expression by the court. He indicated that if the conviction were to be allowed in evidence, he "would seriously consider not putting him on the stand."

A brief informal discussion between court and both counsel followed, and several decisions of this and other courts were referred to. The court indicated that there was a question in his mind whether a conviction is admissible if very old. Defense counsel interprets one statement by the court as a definitive ruling that the conviction would be admitted notwithstanding the court's doubts. If it stood alone, the statement would so indicate. The court had, however, indicated uncertainty about the decisions on the point, had said, "We will check it out", indicated he had not read the decisions cited, and (probably because defendant cited cases from another circuit) had twice said he would rule in accordance with the decisions of this court.

The district court was being asked for a ruling in advance. We think he made it sufficiently clear that he wanted to read the pertinent decisions of this court before making up his mind. Although the district court did not refer to the question again, defense counsel did not pursue the

___

**6.** The defendant indicated prior to trial that his defense would be entrapment. Counsel changed his strategy after the ruling.

matter during the remainder of the trial, nor did he include this claim among the grounds on which he moved for a new trial.

No pretrial motion to exclude convictions was ever filed in *Sternback*. Because the district court was being asked for a ruling in advance and stated, "We will check it out," it was *not reasonable for counsel in Sternback* to conclude that a ruling had been made. The situation is completely different in the instant case. McCruiston's counsel filed a pretrial motion *in limine* and it was reasonable for him to expect it would be ruled on pretrial. *See* Fed.R.Crim.P. 12(e). The *last words* of the trial judge indicated that the motion was denied unless the judge changed his mind. If the judge did not intend to rule, he could have continued to say there was no reason to rule at that time. Given the pretrial motion, Rule 12(e), counsel's articulated need for a ruling, and the judge's final words, it was reasonable for counsel to conclude that the motion had been denied.

The majority opinion, in my view, also unfairly lays the blame solely on the defendant. The Government had an obligation also, and it ill-behooves the prosecution now to argue that the defendant waived his request to exclude the convictions by not renewing his motion. The burden of assuring a defendant a fair trial does not fall solely on defense counsel. In the instant case, I believe the prosecution and the judge should have been assigned a fair share of this burden and a new trial should have been awarded.

## III

There is a deplorable tendency prevalent in our federal courts to overlook prejudicial procedural errors in criminal trials. We appellate judge are apt to adopt sophisticated and often sophistical rationales to provide excuses for such errors, all in the interest of affirmance of convictions. The unarticulated reason for affirmance, however, is the belief that the defendant is plainly guilty anyway and that he should not be set free by reason of procedural defects except under the grossest of circumstances. Behind this attitude is the public pressure generated by a perception that the courts are "soft on criminals." Many people find it difficult, I am sure, to understand why obviously guilty felons should be afforded the niceties of procedural due process. It is easy to imagine them thinking, "Why should courts go out of their way to find ways to upset criminal convictions of persons when there seems to be no question about their guilt?"

Technical, convoluted arguments are often advanced by the prosecution to save convictions which are in many instances flawed by the prosecutor's ineptness or his obsessive "overkill" tactics. Unfortunately, these arguments often win the day. If legalistic constructs seem too transparent or unconvincing to advance to the reviewing court, the prosecution falls back on "harmless error." Again, unfortunately, we judges are too often tempted to give the doctrine an expansive and unwarranted application.

The erosion of basic notions of procedural fairness undertaken to preserve the conviction of an obviously guilty defendant may not work an injustice in a particular case, but in the process we are paving the way for the subsequent conviction of an innocent man. It bears repeating that this Nation, two centuries ago, resolved that it was better that a guilty man go free than an innocent man be unjustly punished. An occasional retrial is a small price to pay for the preservation of this ideal.

Our federal judicial system was designed to resist the very public pressure to which I have alluded. Justice ought to be rendered under the rules of law and not according to public opinion. The tendency to forget this fundamental precept brings about debasing, debilitating effects. The criminal defense bar is apt to become disillusioned and cynical. This is dangerous because the defense bar is responsible not only for protecting the rights of their clients but for preserving a fair system of criminal justice for future generations. Defendants, who might be reconciled to their terms in prison if they

thought they had been found guilty fairly and in accordance with the rules of procedure, are apt to become bitter and resist rehabilitative efforts. Above all, our mores embracing an immanent fairness to our fellow human beings are compromised and demeaned.